ATTORNEYS FOR APPELLANT
Elizabeth H. Knotts
Rori L. Goldman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
James O. McDonald
Terre Haute, Indiana

John P. Young
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA TRIAL LAWYERS ASSOCIATION
Steven L. Langer
Valparaiso, Indiana

Tara M. Worthley
Indianapolis, Indiana



**FILED**
Jan 20 2012, 10:03 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

---

No. 84S01-1105-CV-282

INDIANA DEPARTMENT OF INSURANCE,
INDIANA PATIENT'S COMPENSATION FUND,

*Appellant (Defendant below),*

v.

ROBIN EVERHART, PERSONAL
REPRESENTATIVE OF THE ESTATE OF JAMES
K. EVERHART, JR.,

*Appellee (Plaintiff below).*

---

Appeal from the Vigo Superior Court, No. 84D01-0410-CT-10001
The Honorable Phillip I. Adler, Judge

---

On Petition to Transfer from the Indiana Court of Appeals, No. 84A01-0912-CV-614

---

**January 20, 2012**

**Shepard, Chief Justice.**

Robin Everhart filed suit against the Indiana Patient's Compensation Fund (PCF) to recover excess damages after settling a wrongful death claim against an emergency room physician in whose care her husband died. The PCF asked the trial court to reduce its award of damages to account for the twenty percent chance that Robin's husband would have died anyway, even in the absence of the physician's negligence. The trial court declined to do so, awarding Robin the statutory maximum $1 million in excess damages. We affirm, but on slightly different grounds.

## Facts and Procedural History

Around 2 p.m. on October 4, 2004, James K. Everhart, Jr. was riding his motorcycle on Margaret Avenue in Terre Haute, Indiana. Tragically, Larry B. Perkins, an employee of Standard Forwarding Company, Inc., crashed his semi-truck into Everhart's motorcycle and ran over Everhart.

Because the accident occurred so close to a fire station and a bystander ran in to personally alert the paramedics, the paramedics arrived on the scene almost exactly as the first call came into the emergency dispatch. Paramedic James Henderson and EMT Norm Loudermilk both testified that Everhart sustained massive injuries but that they were able to control his bleeding. (Appellant's App. at 16.)

Henderson and Loudermilk both later came to expect Everhart would survive. (Appellant's App. at 17.) Although Everhart appeared unconscious when the paramedics loaded him into the ambulance, he opened his eyes and started speaking to Loudermilk after receiving an intravenous drip and oxygen. (Appellant's App. at 16.) Initially, Everhart registered only a six on the Glasgow Coma Scale (GCS), but he improved to an eleven and then a thirteen on the GCS during the ambulance ride to the hospital. (Appellant's App. at 17.) Although the paramedics could not pick up a blood pressure reading for Everhart, Henderson testified that

their equipment would not have been sensitive enough to pick up a blood pressure of less than 80/40 mmHg. (Appellant's App. at 18.)

The paramedics transferred Everhart to the care of Dr. C. Bilston Clarke, a physician in the emergency room at Terre Haute Regional Hospital. Despite Everhart's severe bleeding at the scene, Dr. Clarke did not immediately administer a blood transfusion to Everhart. Everhart later died of a cardiac arrest while still in Dr. Clarke's care. Everhart left behind his wife and son, Robin and Troy Everhart.

Robin filed a wrongful death suit against Perkins and Standard Forwarding in October 2004. The parties settled for $1.9 million. Robin amended her complaint in October 2005, adding a wrongful death claim against Dr. Clarke. Again, the parties settled out of court, this time for a lump-sum payment and future payments with a total present value of $187,001. Robin then filed a third amended complaint on June 17, 2008, adding a claim against the PCF that sought to recover excess damages over and above her settlement with Dr. Clarke.

At trial, the parties disputed whether Everhart suffered a cardiac arrest in the ambulance or after arriving at the hospital. Robin's expert witness, Dr. Frank Miller, testified that if Everhart had suffered a cardiac arrest <u>after</u> arriving at the hospital, then he would still have stood an eighty percent chance of surviving his injuries if he had received proper medical care. (Appellant's App. at 19–20.) By contrast, the PCF's expert witness, Dr. Geoffrey L. Billows, testified that if Everhart had suffered a cardiac arrest <u>before</u> arriving at the hospital, then he would only have stood a zero to three percent chance of surviving his injuries even with proper medical care. (Appellant's App. at 17.)

Finding that Everhart did not suffer a cardiac arrest until after arriving at the hospital, the trial court accepted Dr. Miller's opinion that Everhart stood an eighty percent chance of recovering had he received proper medical care. (Appellant's App. at 19–20.) It accepted Henderson's testimony that the equipment in the ambulance would not have been sensitive enough to pick up some blood pressure readings and Dr. Billows' testimony that it would have

3

been physically impossible for anyone suffering a cardiac arrest to exhibit a GCS of thirteen. (Appellant's App. at 18.)

Relying on our holdings in Atterholt v. Herbst, 902 N.E.2d 220 (Ind. 2009), Cahoon v. Cummings, 734 N.E.2d 535 (Ind. 2000), and Mayhue v. Sparkman, 653 N.E.2d 1384 (Ind. 1995), the PCF argued that it should not be responsible for the portion of Everhart's injuries he probably would have sustained even in the absence of any medical negligence. (Appellant's App. at 82–85.) The PCF therefore urged the trial court to reduce any award of damages by twenty percent to account for the chance that Everhart would have died anyway, even if Dr. Clarke had rendered proper medical care. (Appellant's App. at 21.) The PCF further argued that it was entitled to a set-off in an amount equal to the payments Robin received in settlement from Standard Forwarding and Dr. Clarke's insurance company. (Appellant's App. at 85.)

Instead, after finding that the plaintiffs' losses exceeded $3.15 million, the trial court held that our Mayhue line of cases applied only when a patient initially stood a fifty percent or worse chance of avoiding any injury. (Appellant's App. at 31.) The court refused to reduce its overall finding on injuries by twenty percent and therefore awarded Robin and Troy the remaining $1 million of the statutory cap. (Appellant's App. at 21, 32.) Because the court found that Robin and Troy's actual losses exceeded their recoveries from Standard Forwarding and Dr. Clarke's insurance company plus the maximum amount of excess damages the trial court could impose on the PCF, the court found it unnecessary to address the PCF's argument that it was further entitled to a set-off in the amount equal to what Robin and Troy already recovered in settlements. (Appellant's App. at 28, 31.) It further declined to address Robin's response that it should reduce the amount of any set-off to account for Robin's attorneys' fees and expenses. (Appellant's App. at 28, 31.)

On appeal, the Court of Appeals reversed based on our Mayhue line of cases and therefore remanded for further findings of fact as to the damages owed Robin, Troy, and Everhart's estate. Indiana Dep't of Ins. v. Everhart, 932 N.E.2d 684 (Ind. Ct. App. 2010). We granted transfer. Indiana Dep't of Ins. v. Everhart, 950 N.E.2d 1208 (Ind. 2011) (table).

4

**Standard of Review**

On an appeal from a final judgment, we review conclusions of law <u>de novo</u>. <u>Johnson v. Johnson</u>, 920 N.E.2d 253 (Ind. 2010). When a trial court has entered separate findings of fact and conclusions of law, we review findings of fact for clear error. Ind. Trial Rule 52(A). But a trial court's characterization of an issue as a finding of fact does not constrain us when the issue more appropriately constitutes a question of law.

### I. <u>Cahoon</u> Did Not Address the Better-Than-Even Cases.

The Indiana Medical Malpractice Act caps a recovery for a patient's injury or death at $1,250,000. Ind. Code § 34-18-14-3(a)(3) (2008). The Act limits the liability of a qualified health care provider whose medical negligence proximately caused the injury or death to the first $250,000 of damages. Ind. Code § 34-18-14-3(b). If a judgment or settlement fixes damages in excess of a qualified health care provider's liability, then a plaintiff may recover excess damages from the PCF. Ind. Code § 34-18-14-3(c).

In a suit to recover excess damages from the PCF, an earlier settlement with a qualified health care provider conclusively establishes his liability. Ind. Code § 34-18-15-3(5) (2008). Nevertheless, in <u>Herbst</u>, we held that evidence of a patient's preexisting risk of harm was still admissible for the purpose of determining the amount of excess damages to which the plaintiff was entitled. <u>Herbst</u>, 902 N.E.2d at 222–23. The fact that evidence of a preexisting risk of harm would also be relevant to liability were liability at issue did not preclude admitting that evidence for some other purpose. <u>See</u> <u>id.</u>

Our holding in <u>Herbst</u> was a necessary consequence of <u>Cahoon</u>, in which we held that a successful <u>Mayhue</u> claim for causing an increased risk of harm entitled a plaintiff to damages in proportion to that increased risk. <u>Cahoon</u>, 734 N.E.2d at 541. In <u>Cahoon</u>, a wife filed suit for the wrongful death of her husband, who stood only a twenty-five to thirty percent chance of

5

recovering even before a physician failed to diagnose his esophageal cancer. Id. at 538. We concluded that the appropriate measure of damages was equal to the total amount of damages ordinarily allowed in a wrongful death suit multiplied by the difference between the pre-negligence and post-negligence chances of survival. See id. at 540–41 (citing McKellips v. St. Francis Hosp., Inc., 741 P.2d 467, 476–77 (Okla. 1987)).

The PCF therefore argues that our decision in Herbst required the trial court to reduce its award of damages in proportion to Everhart's preexisting risk of death. (Appellant's Br. at 14.) But the PCF has not cited any Indiana cases in which a court held that a plaintiff who more likely than not would have avoided any injury but for the defendant's negligence could only recover proportional damages.[1] As both Robin and the trial court noted, however, all the decisions in our Mayhue line of cases involved patients who stood a fifty percent or worse chance of recovering before suffering some medical negligence. (Appellant's App. at 21; Appellee's Br. at 10–14.)

This distinction is not a coincidence, as Mayhue reflects a special concern for plaintiffs who stood a fifty percent or worse chance of recovering before suffering some form of medical negligence. In Mayhue, a husband filed suit for loss of consortium after a physician negligently failed to diagnose cancer in his wife, who later passed away. Mayhue, 653 N.E.2d at 1385–86. We affirmed the trial court's decision to deny summary judgment to the defendant even though the wife would have stood less than a fifty percent chance of surviving even if the physician had

---

[1] The PCF appears to have cited Smith v. Washington, 734 N.E.2d 548 (Ind. 2000), for this proposition in the summary of its argument. (Appellant's Br. at 7) ("The Indiana Supreme Court has already applied proportional damages to cases with a better-than-even pre-negligence chance of survival."). But this citation is somewhat misleading. Several times in that opinion, we described Smith's chances of avoiding injury in the absence of any medical negligence as amounting to an even fifty percent. Smith, 734 N.E.2d at 550–51. Moreover, we expressly declined to determine whether the applicability of our increased-risk-of-harm analysis depended on a patient's initial chances of recovering, in part because the patient had argued for its application before the trial court. Id.

rendered proper medical care, and even though the husband therefore could not establish that the physician's negligence was the cause-in-fact of her death.  Id. at 1385.

As we noted in Mayhue, this situation presents an obvious problem because this type of plaintiff could never establish proximate cause under the traditional analysis no matter how negligent the physician's conduct.  Id. at 1387.  We therefore fashioned a solution to this particular problem based on Restatement (Second) of Torts § 323 (1965).[2]  Id. at 1388.  Other courts that based their loss-of-chance doctrines on Section 323 likewise made clear that their purpose in adopting a loss-of-chance doctrine was to ensure that patients with a fifty-percent or worse chance of recovering would still receive the same care as healthier patients by preventing physicians from claiming a blanket release from liability under the label of cause-in-fact.  See, e.g., Herskovits v. Group Health Coop., 664 P.2d 474, 476–77 (Wash. 1983) (thirty-nine percent chance of recovery pre-negligence); see also Thompson v. Sun City Cmty. Hosp., 688 P.2d 605, 615–16 (Ariz. 1984) (five to ten percent chance); McKellips, 741 P.2d at 470 (chance uncertain).  See generally John D. Hodson, Medical Malpractice:  "Loss of Chance" Causality, 54 A.L.R.4th 10 (1987 & Supp. 2011).

Mayhue's scope is important because Cahoon established only the measure of damages in cases involving a Mayhue claim.  In Cahoon, we stated that "upon a showing of causation under Mayhue, damages are proportional to the increased risk attributable to the defendant's negligent act or omission."  Cahoon, 734 N.E.2d at 541.  Because bringing a Mayhue claim is only necessary when a plaintiff cannot establish cause-in-fact under traditional negligence principles,

---

[2] The Restatement (Third) of Torts criticizes this approach because Section 323 appears in a chapter dealing with duties, not causation.  Restatement (Third) of Torts:  Liability for Physical and Emotional Harms § 26 cmt. n (2005).  More recent cases from other jurisdictions have trended away from this approach, preferring to recognize loss of chance as a legally cognizable injury in its own right.  See, e.g., Matsuyama v. Birnbaum, 890 N.E.2d 819, 831–32 (Mass. 2008); see also Lord v. Lovett, 770 A.2d 1103, 1105–06 (N.H. 2001); Alberts v. Schultz, 975 P.2d 1279, 1283 (N.M. 1999).

Cahoon did not, at least by its terms, apply to cases in which a plaintiff stood a better-than-even chance of recovering before suffering some form of medical negligence.

Indeed, the general rule in a suit for negligence is that a plaintiff may recover damages for all injuries the defendant proximately caused. See Bader v. Johnson, 732 N.E.2d 1212, 1220 (Ind. 2000) (citing Erie Ins. Co. v. Hickman by Smith, 622 N.E.2d 515, 519 (Ind. 1993); Peak v. Campbell, 578 N.E.2d 360, 361 (Ind. 1991)). We therefore interpret the PCF's argument as a request that we extend the Cahoon approach to cases involving patients who stood a better-than-even chance of recovering. We conclude that this case represents an inappropriate vehicle for deciding whether to do so.

Decisions like Mayhue and Cahoon arose from the scholarly criticism that the traditional rule undercompensated some plaintiffs for their injuries and undercharged some physicians for their negligence. See, e.g., Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1377, 1387 (1981). Under the traditional analysis, a plaintiff who could show only a forty-nine-percent chance that the patient would not have suffered some injury but for the physician's negligence would not recover anything. See David A. Fischer, Tort Recovery for Loss of Chance, 36 Wake Forest L. Rev. 605, 627 (2001). Because over a large number of cases it seems statistically certain that some of these less-than-even patients would have lived, this all-or-nothing rule left some plaintiffs who had actually suffered an injury at the hands of a defendant out in the cold. See King, supra, at 1377.

But this coin had a flip-side: A plaintiff who showed a fifty-one percent chance that the patient would not have died but for the physician's negligence would be entitled to recover damages in the amount of 100 percent of her injuries. See Fischer, supra, at 627. Because over a large number of cases it seems statistically certain that some of these better-than-even patients would have died anyway, the all-or-nothing rule punished some physicians who did not actually cause any injury at all. See King, supra, at 1387. Assuming the probabilities of patients avoiding harm in the absence of medical negligence fell in an even distribution around a mean of

8

fifty percent, however, these errors may have simply canceled each other out, adequately compensating plaintiffs for injuries and deaths and adequately charging physicians for their negligence as classes, if not as individuals.  See Fischer, supra, at 631.

Once courts addressed the problem of undercompensating plaintiffs by issuing decisions like Mayhue and Cahoon, however, some commentators argued that awarding proportional damages in less-than-even cases and full damages in better-than-even cases systematically imposed punitive damages on physicians.  E.g., Fischer, supra, at 628.  Thus, the argument goes, courts should extend decisions like Cahoon to better-than-even cases.  See Fischer, supra, at 628; Jonathan P. Kieffer, The Case for Across-the-Board Application of the Loss-of-Chance Doctrine, 64 Def. Couns. J. 568, 568–69 (1997); King, supra, at 1387.  But others have defended awarding proportional damages at or below the fifty percent threshold and full damages above it.  E.g., Lori R. Ellis, Note, Loss of Chance as Technique:  Toeing the Line at Fifty Percent, 72 Tex. L. Rev. 369, 383 (1993); see also Fischer, supra, at 628–29 (acknowledging one-time tortfeasors and difficulty financing lawsuits as possible reasons for not extending proportional damages to better-than-even cases).

For all the academic interest in this issue, however, very few courts in other jurisdictions have confronted it.  The PCF has cited Chief Justice Marshall's opinion in Renzi v. Paredes, 890 N.E.2d 806 (Mass. 2008), for the proposition that a Massachusetts court would apply proportional damages in a better-than-even case, but Renzi provides less support for this proposition than the PCF asserts.  In Renzi, a husband sued a physician for failing to diagnose his wife's cancer.  Id. at 810.  The plaintiff's expert witness testified that the wife would have stood a fifty-eight percent chance of surviving had the physician timely diagnosed her cancer from her mammogram, but the defendant's expert testified that she would have stood only a twenty percent chance.  See id. at 811 & n.8.  The jury found that the physician's negligence was not a substantial contributing factor in causing the wife's death, but that it was a substantial

contributing factor in causing the loss of a substantial chance to survive. Id. at 812. Nevertheless, the jury awarded the plaintiff full damages,[3] apparently because the judge refused to instruct the jury on proportional damages. Id. at 813–16.

On appeal, the Supreme Judicial Court held that the trial court should have instructed the jury on proportional damages. Id. at 813. It noted that loss of chance and wrongful death were distinct theories of injury, and that the physician's negligence proximately caused only the wife's loss of chance, not her actual death. Id. Indeed, the Massachusetts court remanded for a new trial solely on the issue of damages, thereby accepting the jury's finding that the physician's negligence was not the proximate cause of the patient's death. Id. at 813. Renzi therefore seems not to demonstrate that a Massachusetts court would apply proportional damages in a case like Robin Everhart's, in which the plaintiff could show that the physician's negligence did proximately cause the patient's actual death, not merely a loss of chance.

The case coming closest to bearing on point seems to be Scafidi v. Seiler, 574 A.2d 398 (N.J. 1990). In Scafidi, parents sued a physician for failing to prevent a premature birth by timely administering medication to halt the mother's labor, seeking to recover for the wrongful death of their daughter. Id. at 400–01. The mother suffered from a preexisting condition that put the child at risk of premature birth and death. Id. The plaintiffs' expert testified that if the physician had timely administered the medication, then the child would have stood a seventy-five to eighty percent chance of avoiding premature birth. Id. But the defendant's expert

---

[3] This would be something of an understatement. The plaintiff's expert testified that the economic loss from the patient's death amounted to a present value of $1,019,936. Renzi, 890 N.E.2d at 811. But the jury awarded "total economic losses" of $1.4 million. Id. at 815. The trial court entered judgment against the defendants in the amount of $2.8 million, which appeared to reflect the judge's error in doubling the jury's actual award of $1.4 million by adding the total to all of its constituent parts. See id. at 812, 815. But the Supreme Judicial Court reversed because the jury instructions conflated standard wrongful death damages and loss-of-chance damages, calling into question the integrity of the $1.4 million figure in the first place. Id. at 813–16.

10

testified that even if the physician had acted timely, then the child would still have stood only a twenty-five percent chance of avoiding premature birth.  Id.  The jury found that the physician was negligent but that his negligence did <u>not</u> proximately cause the child's death.  Id. at 401.

Remanding for a new trial, however, the New Jersey Supreme Court instructed the trial court that "any damages . . . assuming that defendant's proofs include evidence that the infant's premature birth and death <u>might</u> have occurred even if defendant's treatment had been proper, should be apportioned to reflect the likelihood that the premature birth and death would have been avoided by proper treatment."  Id. at 400 (emphasis added).  It is therefore possible to read <u>Scafidi</u> as indicating that the New Jersey Supreme Court would apportion damages to account for the mother's preexisting condition even if the child had a better-than-even chance of survival.

Still, even this quick survey of a theoretically thorny area of law makes it clear that both courts and commentators have been focusing on cases in which a single tortfeasor's negligent conduct interacted with a preexisting medical condition.  That is not the case here.  Robin's case differs from our <u>Mayhue</u> line of cases not only in that Everhart stood a better-than-even chance of recovering in the absence of any medical negligence, but also in that joint tortfeasors negligently caused him an indivisible harm.  That latter distinguishing fact triggers our rules on joint and several liability, which make it unnecessary for us to decide today whether to extend <u>Cahoon</u> to better-than-even cases.


## II.    The Rule for Calculating Set-Offs Can Decide This Case.


There is no critical need to decide the <u>Cahoon</u> valuation issue because of how the trial court's peculiar findings of fact interact with the rules for calculating a set-off.  The court found that Robin and Troy's total injuries exceeded the sum of all distinct, legally allowable awards of damages.  A double recovery would therefore have been impossible under a correct application of the set-off rules.  Even if we embraced the PCF's reading of <u>Mayhue</u> and the resulting

11

application of <u>Cahoon</u>, the PCF would <u>still</u> have to pay the statutory maximum in excess damages.

The PCF argues that the trial court should have reduced its finding on injuries by twenty percent to account for harm Dr. Clarke probably did not cause and then further reduced the damages by the amount of Robin's settlement with Dr. Clarke's insurance company <u>and</u> by the <u>full</u> value of her settlement with Standard Forwarding. In other words, it says that after finding that Robin and Troy suffered injuries of at least $3,150,000, the trial court should have reduced that amount to $2,250,000 (twenty percent chance of death in any event), subtracted $250,000 (Dr. Clarke's insurance company) and then subtracted another $1.9 million (Standard Forwarding) to arrive at its final award of damages.

Again, this contention ignores a critical distinction between the <u>Mayhue</u> cases and Robin's case. In the <u>Mayhue</u> cases, the chance that a patient would have suffered some injury regardless of a physician's medical negligence arose from a natural, preexisting medical condition. Here, the chance that Everhart would have died anyway arose as a result of the independent negligence of a joint tortfeasor.

Two or more co-defendants constitute joint tortfeasors if their independent negligent conduct proximately caused some indivisible harm. <u>See</u> <u>Palmer v. Comprehensive Neurologic Servs., P.C.</u>, 864 N.E.2d 1093 (Ind. Ct. App. 2007). At common law, joint tortfeasors were jointly and severally liable for the indivisible harm they caused a plaintiff. <u>Hoesel v. Cain</u>, 222 Ind. 330, 53 N.E.2d 165 (1944); <u>see also</u> Restatement (Third) of Torts: Apportionment § A18 (2005). A plaintiff could sue any of the joint tortfeasors and recover damages in the amount of the entire harm even though another joint tortfeasor had a hand in the injury. <u>Hoesel</u>, 222 Ind. at 334, 53 N.E.2d at 170–71; Restatement (Third) of Torts: Apportionment § 10.

But the Legislature altered this landscape when it passed the Indiana Comparative Fault Act. A leading effect of the Act was to abolish the rule that contributory negligence constituted a complete bar to recovery in most suits for negligence. Ind. Code § 34-51-2-5 (2008). Instead,

the Act requires a jury to allocate a percentage of responsibility for the plaintiff's injuries to each defendant and any nonparty who contributed to those injuries, and each defendant need only pay his proportional share. Ind. Code § 34-51-2-7, -8 (2008). In exchange for giving negligent plaintiffs greater access to the courts, however, the Act abrogates the old rule of joint and several liability in suits to which the Act applies. Huber v. Henley, 656 F. Supp. 508, 511 (S.D. Ind. 1987) ("In return for the removal of the contributory negligence bar to recovery, plaintiffs lost the ability to recover the full measure of damages from any one joint tortfeasor."). Because the Act expressly exempted medical malpractice claims from its ambit, however, the historical rule of joint and several liability would appear to still apply to medical malpractice suits. See Ind. Code § 35-51-2-1(b)(1) (2008); see also Palmer, 864 N.E.2d at 1099–1100. But see Ind. Code § 34-51-2-17 (2008) (imposing time limits on a qualified health care provider's opportunity to plead a nonparty defense and allowing enlargements in limited circumstances).[4]

A plaintiff who settled with one joint tortfeasor, however, might still wish to sue another joint tortfeasor to increase her recovery. Historically, Indiana prevented the plaintiff from doing so under the release rule. See, e.g., Cooper v. Robert Hall Clothes, Inc., 390 N.E.2d 155, 157–58 (Ind. 1979) (citing Bedwell v. DeBolt, 221 Ind. 600, 50 N.E.2d 875 (1943)) (plaintiff's settlement with two defendant companies released remaining jointly and severally liable defendant).

We abrogated the release rule in Huffman v. Monroe County Cmty. Sch. Corp., 588 N.E.2d 1264 (Ind. 1992). We noted that many authorities heavily criticized the release rule and argued for the modern rule that a release of one joint tortfeasor would not discharge any other joint tortfeasor, but that any payments accompanying the release would diminish the recovery the plaintiff could seek from subsequent joint tortfeasors by the amount of the payment. Id. at 1266

---

[4] Neither party contends that the old rule of joint and several liability does not apply here, nor does either party contend that the Court of Appeals erred in Palmer. (Appellant's Br. at 23; Appellee's Br. at 8.)

13

(citing Restatement (Second) of Judgments § 50 (1982); Restatement (Second) of Torts §§ 885, 886 (1979); 3 Harper, Gray & James, The Law of Torts 37 (2d ed., 1986)). Under our present rule, the plaintiff in Cooper would have been able to continue her suit against the third company, but subject to a rule requiring the trial court to reduce the amount of her allowable damages to protect the third jointly and severally liable defendant. See id. at 1267.

We noted in Huffman that a trial court has the power and duty to reduce a jury verdict by an amount already received in an earlier settlement to ensure that a plaintiff does not receive more than one recovery. Huffman, 588 N.E.2d at 1267 (citing Manns v. Indiana Dep't of Highways, 541 N.E.2d 929 (Ind. 1989)). Indeed, we had already held that when a jury returned a verdict against a jointly and severally liable defendant after another jointly and severally liable defendant had already settled in exchange for a covenant not to sue, a court should adjust pro tanto the amount of any damages determined by the jury verdict by subtracting any consideration received from the amount of any damages determined by the jury verdict. Manns, 541 N.E.2d at 934.

The action in Manns arose before the effective date of the Comparative Fault Act, which would appear to abrogate Manns for cases that come within its provisions. See Mendenhall v. Skinner & Broadbent Co., 728 N.E.2d 140, 143 (Ind. 2000); see also Manns, 541 N.E.2d at 931. The Manns rule for set-offs, however, remains good law for cases that involve joint torfeasors but fall outside the Comparative Fault Act.[5]

The Court of Appeals applied this same one-satisfaction doctrine in Palmer, the case the PCF cites for the proposition that a joint tortfeasor in a medical malpractice suit is entitled to a

---

[5] In theory, the PCF could have fared even worse if the Comparative Fault Act applied. In Mendenhall, we held that a joint tortfeasor who failed to plead a nonparty defense in accordance with the Act could not obtain a set-off in the amount of an earlier joint tortfeasor's settlement at all. Mendenhall, 728 N.E.2d at 144–45.

14

set-off for any amount the plaintiff received in exchange for settling with another joint tortfeasor. Palmer, 864 N.E.2d at 1100–01. In Palmer, the plaintiff filed suit against a physician, the physician's professional corporation, and multiple non–qualified health care providers on a theory of joint and several liability for medical malpractice, seeking damages for the wrongful death of her husband. Id. at 1095. The non–qualified providers settled with the plaintiff in an aggregate amount that exceeded the jury's subsequent $375,000 finding on total injuries. Id. at 1097 & n.4. The remaining joint tortfeasors filed a motion to correct error asking the trial court to reduce the award of damages by the amount of the earlier settlements. Id. at 1097. The court did so, entering judgment against the remaining joint tortfeasors in the amount of $0, and the Court of Appeals affirmed. Id. at 1095, 1102.

Here, the PCF belatedly concedes that Perkins and Dr. Clarke constitute joint tortfeasors.[6] (Appellant's Br. at 23–24.) Perkins's negligent driving and Dr. Clarke's negligent medical care both caused a single indivisible harm: Everhart's death. Under the pure common law rule of joint and several liability, Robin could have sued either Perkins or Dr. Clarke and recovered from the defendant of her choice damages in the entire amount of the injuries she and Troy suffered. The second defendant, however, would have been entitled to a set-off from the total judgment against him in the amount of any settlement Robin reached with the first. Because the PCF assumes Dr. Clarke's liability over and above the statutory cap in the Medical Malpractice Act, the PCF is entitled to the same set-off and no more.

The trial court found that Robin and Troy suffered injuries of at least $3.15 million. Under the Manns rule for set-offs, the court should have reduced its finding on total injuries by $1.9 million on account of the settlement with Standard Forwarding. The court should have

---

[6] Actually, the PCF actively advances this theory at the very end of its brief, not so much to point us to the appropriate rules for calculating a set-off, but rather merely to establish that it is entitled to some set-off, before going on to argue that the common fund doctrine should not reduce that set-off. (Appellant's Br. at 23–24.)

further reduced that amount by another $250,000 on account of the settlement with Dr. Clarke's insurance company. The convenient result: $1 million in uncompensated damages, which is precisely equal to the statutory limit of the PCF's liability for excess damages.[7]

And this result would not change if the trial court had applied Cahoon in apportioning damages. Cahoon apportions damages between all the parties who should fairly bear some of the loss. The PCF concedes that Dr. Clarke caused eighty percent of the plaintiffs' injuries. Because the only possible causes of Everhart's death are two known joint tortfeasors, however, this concession is tantamount to conceding that Standard Forwarding caused the remaining twenty percent. Initially, the PCF would be responsible for $2,520,000 in damages, whereas Standard Forwarding would be responsible for $630,000. At most, the PCF would therefore only be entitled to a set-off on account of the settlement with Standard Forwarding to the extent that it exceeded Standard Forwarding's liability. Giving the PCF the benefit of this set-off in the amount of $1,270,000 and a further $250,000 set-off on account of the settlement with Dr. Clarke's insurance company would still leave a remaining $1 million in uncompensated damages for the PCF to cover in excess damages payable to Robin and Troy.

Reducing the finding on injuries by twenty percent and then subtracting the full $1.9 million from the remainder, and then another $250,000, as the PCF asks, effectively ignores that Standard Forwarding, not Robin and Troy, should bear the remaining loss. Indeed, doing so

---

[7] This very well may have been the thought process of the appellee's counsel when, in his proposed findings of fact, he asked the trial court to find injuries of "at least $3,150,000," an otherwise odd number given evidence and argument that Robin and Troy suffered injuries as high as $54,120,000. (Appellant's App. at 14.) This very well may also have been the court's thought process when it adopted the appellee's counsel's proposed findings of facts with very few changes. (Appellant's App. at 15–32.) Our inability to know for sure, however, is one reason why we do not encourage trial courts to adopt proposed findings of fact wholesale. See Cook v. Whitsell-Sherman, 796 N.E.2d 271, 273 n.1 (Ind. 2003). But we recognize that this practice is a practical response to the need to keep the docket moving despite an enormous volume of cases and a lack of law clerks and other resources that might make the practice unnecessary. Prowell v. State, 741 N.E.2d 704, 708–09 (Ind. 2001).

16

would magically wipe out $630,000 of Robin and Troy's total recovery and leave the PCF with a windfall in the same amount. In essence, the PCF would succeed in turning the one-satisfaction doctrine from a shield into a sword. The purpose of the one-satisfaction doctrine is to prevent a plaintiff from realizing <u>more</u> than one recovery. It is plainly not to reduce a plaintiff to realizing <u>less</u> than one full recovery.

As a result, we do not see any grounds on which we could reduce the trial court's award of $1 million in excess damages, so deciding whether to extend or halt <u>Cahoon</u>'s advance would seem unnecessary at best. Because we hold that the PCF was not entitled to a set-off, we also need not address Robin's argument that the trial court should reduce any set-off based on fees and expenses.

## Conclusion

For the reasons stated above, we affirm the trial court.

Dickson, Sullivan, Rucker, and David, JJ., concur.