**FOR PUBLICATION**



**FILED**

Jul 23 2014, 7:42 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES E. AYERS**
Wernle Ristine & Ayers
Crawfordville, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID G. FIELD**
**BRANDON M. KIMURA**
Schultz & Pogue, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSEPH LAYCOCK, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1310-CT-521 |
| | ) | |
| JOSEPH SLIWKOWSKI, M.D., | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-1002-CT-6

**July 23, 2014**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Joseph Laycock appeals the trial court's grant of summary judgment in favor of Joseph Sliwkowski, M.D. We affirm.

**Issue**

Laycock raises one issue, which we restate as whether there is designated evidence that Dr. Sliwkowski caused injury or damages to Laycock.

**Facts**

On November 8, 2005, Laycock was stabbed in the thigh with a red-hot welding wire at work and was immediately treated by a work clinic nurse under Dr. Sliwkowski's supervision. On November 11, 2005, Laycock was seen by the work clinic nurse because his thigh was "swollen, tight, and very painful." App. p. 67. The nurse sent Laycock home after discussion with Dr. Sliwkowski. The next day, the pain became unbearable, and Laycock went to the emergency room, where he was diagnosed with compartment syndrome and underwent surgery for the condition.

In 2007, Laycock filed a proposed medical malpractice complaint with the Indiana Department of Insurance. In 2009, a medical review panel unanimously concluded that the evidence did not support the conclusion that Dr. Sliwkowski failed to comply with the appropriate standard of care and that the conduct complained of was not a factor in the resultant damages.

In 2010, Laycock filed a complaint against Dr. Sliwkowski.[1]  The complaint alleged that Dr. Sliwkowski had a duty to exercise reasonable care to see that Laycock obtained proper treatment, that Dr. Sliwkowski failed to use ordinary skill, care, and diligence, and "[t]hat as a direct and proximate result of the actions and omissions . . . , the Plaintiff suffered certain injuries and damage." Id. at 12.

Dr. Sliwkowski eventually moved for summary judgment based on the medical review panel's opinion.  In response, Laycock designated an affidavit, in which Dr. Herbert Hermele asserted that Dr. Sliwkowski failed to meet the standard of care on November 8, 2005, and November 11, 2005, and that the failures to diagnose and refer and the delay in diagnosis caused Laycock to have increased tissue damage, pain, swelling, bleeding, loss of range of motion, and impairment of function.  Dr. Sliwkowski then withdrew his motion for summary judgment.

Dr. Hermele was deposed, and Dr. Sliwkowski filed another motion for summary judgment asserting that there were no genuine issues of material fact regarding a breach of the standard of care on November 8, 2005, or causation and damages on November 11, 2005.  In support of his motion, Dr. Sliwkowski designated the review panel's opinion and portions of the Dr. Hermele's deposition testimony about the November 11, 2005 treatment in which Dr. Hermele stated:

> Q.     What would have been the course of care had he gone
> to an ER that night?

---

[1]  Although the complaint also alleged another doctor was negligent, in October 2010, an agreed order of summary judgment was entered in favor of that doctor.

3

A.    It would have been the same, just a day sooner than what was done on the 12th. Once he got to the emergency room, I think everything was done appropriately and they, in fact, said this is a compartment syndrome, I think. I can't assure you, but I think if he had walked in on the 11th, they would have said this is a compartment syndrome, and then the clinical story would have been just one day sooner, not different, just sooner. This is one of those situations where the clock does count.

Q.    He would have still had to have the embolization?

A.    Yes.

Q.    He would still have had to have had the fasciotomy?

A.    Yes.

Q.    The semitendinosus would have still been viable?

A.    Yes.

Q.    So everything he experienced at Methodist Hospital on the 13th (sic) of November, 2005 would have been experienced one day sooner.

A.    Yes.

Q.    And is that why you said earlier you only have an opinion as to a deviation of the standard of care?

* * * * *

A.    . . . . Whatever they did on the 12th would have been done on the 11th. Now, could I then say what the surgery would have looked like a day sooner? No, nobody can; but there's no doubt that this man had a compartment syndrome because we had a surgeon say he opened up a compartment syndrome.

Q.    Which was going to happen?

4

A.    Which was going to happen anyway, correct. I'm not disputing that the man was going to come to surgery; it was a question of when the man was going to come to surgery. Again, the sooner the better.

Q.    So am I understanding you, then, to be of the opinion that Dr. Sliwkowski deviated from the standard of care on November 11, 2005 by not referring Mr. Laycock to the ER or back to the orthopaedic specialist?

A.    Yes.

Q.    But that everything that happened afterwards was going to happen anyway?

A.    Yes.

Q.    So you have an opinion of a deviation of the standard of care, but you do not have an opinion on causation damages in this case?

A.    That's correct.

Q.    These damages, the surgeries, the fasciotomy, was going to happen, whether its happening on November 11th, the 12th or the 13th?

A.    Yes.

Q.    You have no opinion that Dr. Sliwkowski's November 11th deviation caused Mr. Laycock harm?

A.    You want to avoid delay in the diagnosis and then treatment of a compartment syndrome. I'm not aware of the patient's current situation. I can't comment on any of that. All I can say is delay is not a good thing, and the sooner that the diagnosis is made and the treatment is initiated, the better the results in a general sense.

Q.    Do you have any evidence that his condition is worse because of a 24-hour delay in this case?

5

A. Not in this case; just as a generalization. Again, the clock matters, and the sooner the better; but no, I can't comment on that, no, I cannot.

* * * * *

Q. Because there can be a deviation – in the law, there can be a deviation of the standard of care, but there is no harm because things happened as they would have regardless?

A. Correct.

Q. Is that your opinion here? There is deviation in the standard of care, but there is no causation, no damages?

A. My opinion is there is a deviation in the conclusion of what needed to be done when he was seen on November 11th. I can't comment on damages or morbidity because I'm not aware of it. I don't know what the patient looks like now.

* * * * *

Q. . . . . Whether Dr. Sliwkowski sends him to the ER on the 11th or he goes on the 12th, whatever sequela or by-products of an embolization and a fasciotomy and whether that scars up and all of those things associated with those surgeries and that initial penetrating injury are going to occur no matter what?

A. Yes.

Id. at 76-77. On cross-examination, Dr. Hermele clarified:

Q. Doctor, I think you've said this in explanation, but would it also be the case that the delay in surgery, in this case at least a day, increased the chance that ultimate damage to tissue would be greater?

A. Yes. The physiology of compartment syndrome is that it's time-related, yes.

6

Id. at 77. On redirect examination, Dr. Hermele stated:

> Q.     Dr. Hermele, what is, in your expert opinion, the percentage difference in the tissue damage that Mr. Laycock sustained in the 24-hour period?
>
> A.     Unknown.
>
> Q.     Zero? You don't have any idea?
>
> A.     I don't think anybody has any idea?
>
> Q.     You can't quantify that in any degree?
>
> A.     No.

Id. Laycock responded and designated a second affidavit by Dr. Hermele, which Dr. Sliwkowski moved to strike. The trial court granted Dr. Sliwkowski's motion to strike and his motion for summary judgment. Laycock filed a motion to correct error, which the trial court denied. Laycock now appeals.[2]

**Analysis**

Laycock argues that summary judgment was improper because there are questions of fact related to causation regarding the November 11, 2005 treatment.[3] "We review an appeal of a trial court's ruling on a motion for summary judgment using the same standard applicable to the trial court." Perdue v. Gargano, 964 N.E.2d 825, 831 (Ind.

---

[2] In his deposition, Dr. Hermele testified that Dr. Sliwkowski did not deviate from the standard of care on November 8, 2005, and Laycock does not dispute the trial court's entry of summary judgment relating to the treatment on November 8, 2005.

[3] To the extent Laycock challenges the trial court's ruling on Dr. Sliwkowski's motion to strike Dr. Hermele's second affidavit, Laycock does not develop cogent argument supported by citation to authority. This issue is waived. See Belden Inc. v. Am. Elec. Components, Inc., 885 N.E.2d 751, 755 n.2 (Ind. Ct. App. 2008), trans. denied; Ind. Appellate Rule 46(A)(8)(a) (requiring a party's contentions to "be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on . . . .").

2012). "Therefore, summary judgment is appropriate only if the designated evidence reveals 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Ind. Trial Rule 56(C)). Our review of summary judgment is limited to evidence designated to the trial court. Id. (citing T.R. 56(H)). All facts and reasonable inferences drawn from the evidence designated by the parties is construed in a light most favorable to the non-moving party, and we do not defer to the trial court's legal determinations. Id.

"In a medical malpractice case those elements are: (1) that the physician owed a duty to the plaintiff; (2) that the physician breached that duty; and (3) that the breach proximately caused the plaintiff's injuries." Mayhue v. Sparkman, 653 N.E.2d 1384, 1386 (Ind. 1995). Summary judgment is appropriate when the undisputed material evidence negates one element of a claim. Rhodes v. Wright, 805 N.E.2d 382, 385 (Ind. 2004).

Generally, "Proximate cause involves two inquiries: (1) whether the injury would not have occurred but for the defendant's negligence and (2) whether the plaintiff's injury was reasonably foreseeable as the natural and probable consequence of the act or omission." Nasser v. St. Vincent Hosp. & Health Servs., 926 N.E.2d 43, 48 (Ind. Ct. App. 2010), trans. denied. Although proximate cause is generally a question of fact, it becomes a question of law where only a single conclusion can be drawn from the designated evidence. Carey v. Indiana Physical Therapy, Inc., 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010), trans. denied.

In <u>Mayhue</u>, our supreme court acknowledged that in certain medical malpractice related cases an alternate approach to establishing causation is appropriate. Specifically, "[w]here a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears." <u>Mayhue</u>, 653 N.E.2d at 1387. "No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact." <u>Id.</u> In such circumstances, the <u>Mayhue</u> court adopted the approach taken in the Restatement (Second) of Torts § 323, which provides:

> One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm. . . .

<u>Id.</u> at 1388. "[O]nce the plaintiff proves negligence and an increase in the risk of harm, the jury is permitted to decide whether the medical malpractice was a substantial factor in causing the harm suffered by the plaintiff." <u>Id.</u>

On appeal, Laycock asserts that <u>Mayhue</u> stands for the general proposition "that an increased risk of harm is proper causation grounds for an action in medical negligence" and suggests that "proof of wrong, followed by evidence of increased (but not quantified) risk of harm makes a complete and sufficient cause ready to go to the

9

jury."[4] Appellant's Br. pp. 9, 11. Thus, Laycock seems to be arguing that, once he proved negligence and an increased risk of harm, a jury was permitted to decide whether the medical malpractice was a substantial factor in causing the harm suffered by him.

In support of his argument, Laycock relies on Wolfe v. Estate of Custer, 867 N.E.2d 589 (Ind. Ct. App. 2007), trans. denied, as an example of what he describes as a "non-50% fatal disease" case that went to trial and did not require "percentage evidence." Id. at 11. Laycock's reliance on Wolfe is misplaced, however, because in Wolfe, the parties agreed that the Mayhue increased risk of harm standard of causation applied. Wolfe, 867 N.E.2d at 597 ("Both parties agree that the § 323 increased risk of harm standard of causation, as set forth in Mayhue, applies in the instant case."). That is not the case here.

As we have explained, "Before a plaintiff in a medical malpractice action may invoke the 'increased risk of harm' standard, the plaintiff must establish that it is within the class of plaintiffs to which the lesser standard of causation under Section 323 may be applied." Dughaish ex rel. Dughaish v. Cobb, 729 N.E.2d 159, 166 (Ind. Ct. App. 2000), trans. denied. If a plaintiff cannot carry his or her burden to invoke Section 323, the traditional standard of proximate cause applies. Id.

---

[4] Laycock appears to maintain that this is a traditional negligence case. Laycock's complaint was based on traditional negligence elements and did not reference an increased risk of harm. At the hearing on Laycock's motion to correct error, Laycock described the case as an "everyday run of the mill medical malpractice case." Tr. p. 41. He went on to argue, "it is a classic medical malpractice case. There is no allegation of failure in chance or increased risk of chance as in Mayhue." Id. In the Summary of Argument of his appellate brief, Laycock describes this case as "a normal Medical Malpractice case[.]" Appellant's Br. p. 5.

Moreover, our supreme court has recently explained that <u>Mayhue</u> "established an alternative means of proving causation where traditional means are inadequate" and "'reflects a special concern for plaintiffs who stood a fifty percent or worse chance of recovering before suffering some form of medical negligence.'" <u>Robertson v. B.O.</u>, 977 N.E.2d 341, 346 (Ind. 2012) (quoting <u>Indiana Dep't of Ins. v. Everhart</u>, 960 N.E.2d 129, 134 (Ind. 2012)). The <u>Robertson</u> court referred to three wrongful death cases in which the decedents had less than a fifty percent chance of survival even prior to the claimed malpractice and explained, "[f]or these types of cases—and <u>only</u> these types of cases—in <u>Mayhue</u> we adopted the Restatement (Second) of Torts § 323 (1965) increased risk of harm approach." <u>Id.</u>; <u>see also</u> <u>Everhart</u>, 960 N.E.2d at 134 (explaining that "all the decisions in our <u>Mayhue</u> line of cases involved patients who stood a fifty percent or worse chance of recovering before suffering some medical negligence"). The purpose of adopting such an approach has been "to ensure that patients with a fifty-percent or worse chance of recovering would still receive the same care as healthier patients by preventing physicians from claiming a blanket release from liability under the label of cause-in-fact." <u>Everhart</u>, 960 N.E.2d at 134. Thus, it is clear that our supreme court intended for <u>Mayhue</u> to alter the standard of causation only in cases where a patient has a fifty percent or worse chance of recovering, not in all cases in which a plaintiff alleges an increased risk of harm.

With this in mind, because there is no claim, let alone evidence, that Laycock had a fifty percent or worse change of recovery from the original injury, we must conclude he has not established that the <u>Mayhue</u> approach applies here. Thus, traditional causation

11

principles apply to his case. Accordingly, Laycock had the burden of producing expert testimony rebutting Dr. Sliwkowski's evidence that he did not cause Laycock's injuries. See Hassan v. Begley, 836 N.E.2d 303, 307 (Ind. Ct. App. 2005) ("[W]hen a medical review panel establishes a lack of causation by the physician, the burden shifts to the patient-plaintiff to produce expert testimony to rebut the opinion of the panel."). To carry his or her burden of proof, a plaintiff must present evidence of probative value based on facts, or inferences to be drawn from the facts, establishing both that the wrongful act was the cause in fact of the occurrence and that the occurrence was the cause in fact of the injury. Daub v. Daub, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994) (affirming the trial court's granting of a motion for judgment on the evidence), trans. denied. "The plaintiff's burden may not be carried with evidence based merely upon supposition or speculation." Id.

Laycock has not met this burden. In his deposition, Dr. Hermele testified that the surgeries were going to happen anyway and that he did not have an opinion about causation or damages. Dr. Hermele stated, "I can't comment on damages or morbidity because I'm not aware of it." App. p. 77. When asked if he had evidence that Laycock's condition was worse because of the delay, Dr. Hermele stated, "Not in this case; just as a generalization." Id. at 76. Dr. Hermele's statement that "the clock matters, and the sooner the better" was a general observation and not specific to Laycock. Id. And, although Dr. Hermele testified that the delay increased the chance that the ultimate damage to the tissue would be greater, he could not testify to a specific difference in the tissue damage sustained by Laycock. In fact, he testified that the difference was

12

"[u]nknown," and he agreed that he "can't quantify that in any degree[.]" <u>Id.</u> at 77. This testimony was not sufficient to create a genuine issue of material fact regarding whether Dr. Sliwkowski's treatment was the proximate cause of Laycock's injuries. The trial court properly granted Dr. Sliwkowski's motion for summary judgment.

## Conclusion

Because the designated evidence does not establish a genuine issue of material fact on the issue of causation, the trial court properly granted Dr. Sliwkowski's motion for summary judgment. We affirm.

Affirmed.

BAKER, J., and CRONE, J., concur.

13