**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 31 2012, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**MICHAEL E. SIMMONS**
**ANDREW P. WIRICK**
Hume Smith Geddes Green &
  Simmons, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JAMES F. BLEEKE**
**CHRISTOPHER D. SIMPKINS**
Bleeke Dillon Crandall, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

GREGORY J. SCHNELKER,                )
                                     )
    Appellant-Petitioner,       )
                                     )
      vs.                    )    No. 49A02-1201-CT-33
                                     )
                                     )
INDIANA DEPARTMENT OF INSURANCE      )
PATIENT'S COMPENSATION AUTHORITY,    )
                                     )
    Appellee-Respondent.        )

APPEAL FROM THE MARION CIRCUIT COURT
The Honorable Louis Rosenberg, Judge
Cause No. 49C01-1102-CT-5849

**October 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Gregory Schnelker appeals the trial court's order which declined to award Schnelker damages for loss of wages and capacity and for increased risk of future physical harm. Schnelker raises four issues which we consolidate and restate as:

I. Whether the trial court erred in denying Schnelker damages for loss of wages and capacity;

II. Whether the court erred in denying Schnelker damages for an increased risk of future physical harm; and

III. Whether the inclusion in the trial court's record of two letters sent by counsel for the Indiana Department of Insurance Patient's Compensation Fund (the "Fund"), related to mediation between the Fund and Schnelker, requires reversal.

We affirm.

The relevant facts follow. Schnelker, who was born on September 5, 1952, worked with industrial insulation and was a member of the National Asbestos Workers Union and the Heat and Frost Asbestos Workers Union. On June 27, 2006, Schnelker submitted an application for social security disability due to liver problems and was awaiting a liver transplant.

Schnelker was working when he received a page indicating that a liver was available for transport, and Schnelker had liver transplant surgery on July 11, 2006. After a nurse attempted to assist Schnelker in moving from his hospital bed to a portable bed, Schnelker informed her that she had hurt his arm. Schnelker went home seven days following his surgery.

On September 19, 2006, Schnelker's application for social security disability was approved. On October 27, 2006, the administrator for the National Asbestos Workers Pension Fund received a Pension Application Form from Schnelker, and Part I of the

form indicated that Schnelker retired or planned to retire on September 1, 2006. Part II of the application indicated that Schnelker would "withdraw completely from any further employment in work regularly performed by the Asbestos Workers Union or in any other building trades craft, except as otherwise provided in the Plan." Plaintiff's Exhibit 7. Part II also indicated that Schnelker stopped working or planned to stop working on July 11, 2006, and that he was requesting an "early" pension. Id.

On June 19, 2007, Schnelker went to the emergency room complaining of shoulder pain that he had been experiencing since the nurse attempted to move him from his bed. At some point, Dr. Frederick Kaplan informed Schnelker that he should have had an MRI earlier and that he needed surgery on his shoulder. The surgery was completed on August 13, 2007. Following his surgery and physical therapy, Schnelker was told to "baby" his shoulder and that the more he used his injured arm the faster it would "wear out." Transcript at 48.

On February 19, 2008, Schnelker filed a proposed complaint for medical malpractice against Indiana University Hospital and Medical Center with the Indiana Department of Insurance Patient Compensation Authority, and the subject of the proposed complaint being his shoulder injury.[1]

---

[1] Schnelker includes this fact in his statement of the case without citation to the record, and our review of the record does not reveal a copy of the proposed complaint. We remind Schnelker that Ind. Appellate Rule 46(A)(5) governs the Statement of Case and provides that "[p]age references to the Record on Appeal or Appendix are required in accordance with Rule 22(C)." Ind. Appellate Rule 22(C) provides: "Any factual statement shall be supported by a citation to the page where it appears in an Appendix, and if not contained in an Appendix, to the page it appears in the Transcript or exhibits, e.g., Appellant's App. p.5; Tr. p. 231-32." Ind. Appellate Rule 50 provides that the appellant's appendix shall contain "pleadings and other documents from the Clerk's Record in chronological order that are necessary for resolution of the issues raised on appeal . . . ."

On February 15, 2011, Schnelker filed a petition for payment from the Fund.[2] On April 12, 2011, the Fund filed an answer.[3] On November 14, 2011, the parties participated in mediation, but the mediation was unsuccessful. On December 8, 2011, the Fund filed a request for written findings. On December 20, 2011, the Fund filed a trial brief, and Schnelker filed a trial brief regarding economic damages.

On December 21, 2011, the court held a bench trial. During direct examination of Schnelker, the following exchange occurred:

> Q. . . . So after your release from your liver transplant what . . . could have worked if you wanted to?
>
> A. Oh, yeah yeah I wouldn't have . . . yeah.
>
> Q. If not for the shoulder?
>
> A. Well if yeah, if the shoulder yeah, yeah. I thought I could do anything that I did two (2) years prior to that, two (2) years whatever before I went to the hospital.

Id. at 57. Schnelker testified that he could not perform his old job with the condition of his current shoulder, that he was planning on returning to work, that he could have performed other jobs and still collect his union pension, and that his daughter had applied for social security disability for him without his knowledge.

On cross-examination, Schnelker indicated that his decision process at the time that he retired was that he added together his social security disability and pension and noticed that it was close to what he would receive if he was still working. Schnelker also

---

[2] The parties do not point to the record and our review does not reveal that this petition was included in the record on appeal.

[3] The record does not contain a copy of the answer.

4

indicated that he was still receiving social security disability for his liver condition and was still disabled based upon his liver condition. On redirect examination, Schnelker stated that he should inform social security that his liver is fine. On re-cross examination, Schnelker testified that he had not sought employment of any kind since his retirement.

On December 29, 2011, the court issued the following order:

### FINDINGS OF FACT

1. This case arises from a shoulder injury experienced by [Schnelker] which occurred while hospitalized after liver transplant surgery on July 11, 2006.

2. [Schnelker has] satisfied all conditions precedent for requesting excess damages from the [Fund].

3. Prior to July 11, 2006, [Schnelker] suffered from end-stage liver disease which necessitated an orthotopic liver transplantation.

4. On June 27, 2006, Mr. Schnelker submitted his application for Social Security Disability for a medical diagnosis of "Malignant Neoplasm – Liver & Intrahepatic Ducts."

5. On September 19, 2006, Mr. Schnelker's Application for Social Security Disability . . . was approved.

6. On October 27, 2006, [Schnelker's] Pension Application Form was received by Carday Associates Inc., administrator for The National Asbestos Workers Pension Fund. On Part II of [Schnelker's] "Retirement Declaration," he indicated that the date he stopped working or planned to stop working was July 11, 2006, which is before he injured his shoulder due to the medical negligence in this case. By completing the "Retirement Declaration," [Schnelker] agreed "I will withdraw completely from any further employment in work regularly performed by the Asbestos Workers Union or in any other building trades craft, except as otherwise provided in the Plan."

7. On [Schnelker's] Pension Application Form, Part I, space 10, he identified the "Date you retired or plan to retire" as September 1, 2006.

5

8.     [Schnelker] requested an "Early" pension and did not request a disability pension.

9.     [Schnelker's] pension, which is "Early Unreduced Retirement," became effective November 1, 2006.

10.    On June 19, 2007, [Schnelker] presented to I.U. Health University Hospital (f.k.a. Clarian Indiana University Hospital) emergency room for complaints of left shoulder pain.

11.    On July 2, 2007, [Schnelker] presented to Dr. Timothy Pettigrew for weakness and pain in his left shoulder. [Schnelker] related to Dr. Pettigrew that he was a retired construction and asbestos worker.

12.    On July 3, 2007, [Schnelker] presented to orthopedist, Dr. Thomas Kaplan. Mr. Schnelker informed Dr. Kaplan that he was retired and that his shoulder problem started in October of 2006.

13.    On July 3, 2007, Dr. Kaplan first informed [Schnelker] that shoulder replacement surgery was an option.

14.    On August 13, 2007, [Schnelker] underwent left shoulder rotator cuff arthroplasty surgery performed by Dr. Kaplan.

15.    [Schnelker's] Social Security Disability was approved and is ongoing for issues solely related to Malignant Neoplasm – Liver & Intrahepatic Ducts.

16.    [Schnelker] applied for elective Early Retirement prior to any diagnosis or treatment for a shoulder injury or torn rotator cuff.

17.    The Social Security Administration has not deemed [Schnelker] medically disabled due to shoulder problems and he continues to receive Social Security Disability payments as a result of his liver issues.

18.    [Schnelker] confirms that his pension and social security benefits equate to approximately 80% - 85% of what he was making while employed, and that is the reason he chose to retire in 2006 as opposed to return to work.

19.    Due to [Schnelker's] elective Early Retirement prior to any diagnosis or treatment related to his left shoulder, he has not

6

sustained any lost wages as a result of his shoulder injury. [Schnelker] did not have a reasonable expectation of receiving future wages, because he had already decided to retire when he concluded that he would make close to the same amount on his disability and pension as if he worked full time.

20.    [Schnelker's] medical expenses as a result of the underlying negligence total $58,651.26.

## CONCLUSIONS OF LAW

1.    This matter is governed by the Indiana Medical Malpractice Act, I.C. § 34-18-1-1 et seq.

2.    This matter before the Court involves a claim for additional damages to be paid from the Indiana Patient's Compensation Fund subject to the limitations of the Act.

3.    Pursuant to I.C. § 34-18-15-3, [Schnelker] has standing to petition the Indiana Patient's Compensation Fund for the damages in excess of the liability of Indiana University Hospital and Medical Center. Consistent with the statute, because the act of malpractice giving rise to this claim occurred after June 30, 1999, the maximum amount which [Schnelker] may recover from the Fund is One Million Dollars ($1,000,000.00).

4.    Pursuant to I.C. § 34-18-15-3(5), "the court shall, after hearing any relevant evidence on the issue of claimant's damage submitted by any of the parties described in this section, determine the amount of claimant's damages, if any, in excess of the two hundred fifty thousand dollars ($250,000) already paid by the insurer of the health care provider." (Emphasis added).[4]

5.    While liability is established if a defendant's negligence causes a plaintiff's damages, the extent of damages is limited to the damage caused by that defendant. *Atterholt v. Herbst*, 902 N.E.2d 220, 224 (Ind. 2009).

6.    In consideration of the evidence, the Court finds that the best estimate of the reasonable medical expenses is the amount that [Schnelker's] providers billed him. Accordingly, the Court finds

---

[4] No emphasis was added in the trial court's order.

7

[Schnelker's] reasonable medical expenses to be Fifty-Eight Thousand, six hundred and fifty-one dollars and twenty six cents. ($58,651.26)[.]

7. [Schnelker] is entitled to an award of general compensatory damages for his pain and suffering. The Court finds that [Schnelker's] left shoulder rotator cuff injury and the subsequent arthroplasty surgery caused him to experience pain and suffering. Accordingly, the Court finds that [Schnelker] is entitled to an award of One Hundred Fifty Thousand Dollars ($150,000.00) for his pain and suffering.

8. [Schnelker] is entitled to an award of general compensatory damages for his loss of enjoyment of life as a result of his shoulder injury. . . . The Court finds that Mr. Schnelker's left shoulder injury did result in a loss of enjoyment of life. Accordingly, the Court finds that [Schnelker] is entitled to an award of One Hundred Fifty Thousand Dollars ($150,000.00) for his loss of enjoyment of life.

9. While several methods could be utilized to establish [Schnelker's] loss of wages and capacity, the Court finds this unnecessary in view of the fact that [Schnelker] had decided to retire from employment and accept his pension and disability before injuring and seeking treatment for his shoulder.

10. [Schnelker] claims that he is entitled to an award of damages for potential future shoulder surgery. Based on Dr. Frederick Kaplan's deposition testimony, it is more likely than not that [Schnelker] will require two subsequent shoulder surgeries. The Court finds that [Schnelker] is entitled to an award of One Hundred Seventeen Thousand Three Hundred Two Dollars and Fifty-Two cents. ($117,302.52) for future shoulder surgeries.

11. The Court finds that [Schnelker's] damages for pain and suffering, loss of enjoyment of life, and the cost of his likely future surgery total $417,302.52. When medical bills ($58,651.26) are added to this amount, the total is $475,953.78. After giving the Indiana Patient's Compensation Fund full credit for the $250,000.00 paid by the health care provider, this Court finds that [Schnelker] is entitled to a supplemental award of $225,953.78.

**LEGAL DISCUSSION OF DENIAL OF LOSS OF WAGES, DIMINISHED EARNING CAPACITY, AND INCREASED RISK OF FUTURE PHYSICAL HARM**

The Court does not presume that retirement rules out recovery for loss of wages or loss of earning capacity. [Schnelker's] retirement does bear, however, on the issue of whether Schnelker's impairment in earning capacity was caused by his shoulder injury or by a desire to leave the job market. Put another way, the act of retiring is probative of whether there was a reasonable expectation of future wages.

Schnelker's intent to return to work is thus a key issue, and it is one on which he bears the burden of proof. The principal evidence offered by Schnelker is his own testimony at trial that he always intended to return to work. Yet the credibility of that testimony was undercut by his deposition testimony as recited by defendant in its trial brief and reiterated on cross-examination.

This court does not doubt that [Schnelker] has a strong work ethic, loved his job and to some extent defined himself by his work. Those traits do not outweigh however, the evidence mustered by [the Fund]. That evidence includes statements made in conjunction with his applications for Social Security and pension. While the Court recognizes that the application for disability benefits was made by his daughter without his consent, Schnelker did not withdraw the application when told of it, nor reject the benefits when received.

The Court also recognizes that it is not uncommon for retirees to change their minds about working. Schnelker might have changed his mind, but for the shoulder injury. But to find as a fact that [Schnelker] would have reentered the job market would simply be speculation on this Court's part.

The Court has declined to make an award for [Schnelker's] claim for damages for an increased risk of future physical harm, in that there has been a failure to prove what expenses or injury were likely to be incurred beyond the award for future surgeries.

## ENTRY OF JUDGMENT

The Court, having rendered the Findings of Fact and Conclusions of Law set forth above, and having recognized and applied a credit against total reasonable damages in the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) as required by Indiana Code § 34-18-14-3(b), and considering the limitation of damages to be awarded against the Defendant fund as set forth in Indiana Code § 34-18-12-3(a), now hereby enters final JUDGMENT in favor of [Schnelker] and against Defendant, Indiana

Department of Insurance Patients Compensation Fund, in the sum of $225,953.78, together with costs.

Appellant's Appendix at 3-9.

After filing a notice of appeal, Schnelker's counsel discovered two documents contained in the record prepared by the trial court clerk. Specifically, Schnelker discovered a letter dated November 9, 2011, written by the Fund's defense counsel to the mediator, and a letter dated November 15, 2011, written by the Fund's defense counsel to the Indiana Department of Insurance.

The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. Menard, Inc. v. Dage-MTI, Inc., 726 N.E.2d 1206, 1210 (Ind. 2000), reh'g denied. In our review, we first consider whether the evidence supports the factual findings. Id. Second, we consider whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. Menard, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. Id. While we defer substantially to findings of fact, we do not do so to conclusions of law. Id. Rather, we review conclusions of law de novo. Ind. Dep't of Ins. v. Everhart, 960 N.E.2d 129, 133 (Ind. 2012). We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. Yoon v. Yoon, 711 N.E.2d 1265, 1268 (Ind. 1999).

10

I.

The first issue is whether the court erred in denying Schnelker damages for loss of wages and capacity. Schnelker argues that the court "simply refused to accept the doctrine of loss of earning capacity as a legitimate and appropriate form of damages under Indiana law." Appellant's Brief at 17. Schnelker asserts that "[t]he question is not whether [he] **would** have gone back to work, but instead is whether he **could** have gone back to work but for the shoulder injury." Id. at 15.

The Fund argues that "Schnelker's statements that he might have later decided to change his mind were sufficiently rebuked on cross-examination, by his inconsistent statements during his deposition, and by his disability and pension applications, all of which establish that [he] intended to retire *prior to* his shoulder injury." Appellee's Brief at 16-17. The Fund also argues that "[a] contrary holding would allow any retired individual, whether that individual is sixty-five (65) years old or eighty-five (85) years old, to self-servingly state after an injury that [he] intended to apply for a new job the following month." Id. at 17.

In his reply brief, Schnelker argues that the evidence shows that his purpose in accepting social security benefits and pension payments in September 2006 was as a "temporary measure, and not a final, conclusive and irrevocable decision to retire forever (if there is such a thing)." Appellant's Reply Brief at 6. Schnelker also argues that "it is the ability (i.e., capacity) of the injured party to work, if he chose to do so, which is the very crux of a claim for lost earning capacity." Id. at 7.

11

Schnelker cites <u>Rieth-Riley Constr. Co., Inc. v. McCarrell</u>, 163 Ind. App. 613, 325 N.E.2d 844 (1975), <u>reh'g</u> <u>denied</u>, in which the court addressed whether the jury was improperly instructed upon loss of earning as an element of damages. On appeal, Rieth-Riley Construction Company, Inc. argued that the instruction was erroneous because it authorized a recovery for Kenneth McCarrell for lost time when the evidence conclusively revealed that at the time of the accident McCarrell was unemployed. 163 Ind. App. at 618, 325 N.E.2d at 847. The court examined the element of damages generally referred to as impaired earning ability. <u>Id.</u> at 618-620, 325 N.E.2d at 847-849. Specifically, the court stated:

> In a personal injury action, upon a proper showing of liability, the plaintiff is entitled to recover for resultant impairment of earning ability, if any. Although called 'impairment of earning ability', that which the plaintiff is entitled to recover is actually the value of the time which he has lost and probably will lose because of the injury. 22 Am.Jur.2d, Damages § 89. Historically, many courts have recognized that this element of damage – value of time – is comprised of two distinct sub-elements which are usually denominated:
>
> > (1) loss of time, and
> >
> > (2) decreased earning capacity.
>
> See, <u>Scott v. Nabours</u> (1973), Ind. App., 296 N.E.2d 438; 22 Am.Jur.2d, Damages §§ 89, 90, 92.
>
> The first of these sub-elements, loss of time, refers to the time which the plaintiff has lost prior to trial because of his injury, while the second, decreased earning capacity, designates the time which probably will be lost after trial. In both cases, it must be emphasized that the compensable element is time. It is the time which belonged to the plaintiff and which plaintiff's injury has deprived him of that is compensable. Thus, most courts permit an employed plaintiff to recover for his time lost even though an insurance company has compensated him for lost wages or his employer continued his wages for all or part of the time of his injury. 22 Am.Jur.2d, Damages §§ 208, 210.

12

In the case at bar, it is the first of the sub-elements of impairment of earning ability, loss of time, with which we are concerned. Rieth-Riley maintains that since McCarrell was not employed at the time of the collision, loss of time was not an appropriate element of damage for jury consideration. As authority Rieth-Riley relies heavily upon the language of Scott v. Nabours, *supra*. In Scott, the court recognized the distinction between the two sub-elements of impairment of earning ability. In doing so, however, the court designated the first element (loss of time) as loss of earnings. While loss of earnings is an appropriate element to consider in determining the value of plaintiff's loss of time, it is by no means the exclusive measure. Generally, see 22 Am.Jur.2d, Damages § 91.

Further insight to this question of compensability of loss of time for an unemployed plaintiff may be gained from the following:

> 'Damages are awarded an injured plaintiff for the loss of his capacity to earn money; they are not awarded for his lost earnings-although earnings at the time of injury, in cases where the plaintiff was employed, are evidence of the value of that earning capacity. Therefore, it is not necessary for the plaintiff to be employed at the time of the injury for the jury to be able to compensate the plaintiff both for the value of the time lost after the injury and before the trial and for the value of the impairment to his capacity to earn money in the future. If sufficient evidence has been introduced, substantial damages may be awarded the unemployed plaintiff for both of these damage elements (lost time and decreased earning capacity). The time belonged to the plaintiff, who had a right to work and to earn money. Even though the plaintiff was not employed, he is entitled to full compensation for an impairment of this right-assuming, of course, that the impairment was the result of the fault of the defendant.

> 'On this basis, an injured housewife has been granted a substantial recovery for the value of the decrease in earning capacity resulting from defendant's fault. Likewise, a person who is performing services gratuitously may recover damages for lost time and impaired earning capacity, and a verdict which does not include these elements has been reversed on appeal.

> 'Difficulty arises in measuring the value of an unemployed plaintiff's lost time and capacity to earn money in the future.

13

> While the law is clear that the plaintiff has a right to his own time – which right cannot be taken from him by a tortfeasor without compensation – the law is also clear that damages cannot be awarded on the speculation, passion, or guess of the injury. *Where damages are not awarded against the tortfeasor for the impairment of earning ability, it is often not because the plaintiff's right was not unlawfully invaded, but because damages were not proved with the requisite degree of certainty. Evidence must be introduced which removes any award from the area of speculative damages. Courts, therefore, admit evidence of plaintiff's age, life expectancy, health, training, experience, intelligence, and talents, as well as the nature of the injuries, to aid the jury in determining reasonable compensation.'* (Footnotes omitted.) 22 Am.Jur.2d, Damages § 100.
>
> In light of the above discussion we are compelled to conclude that the mere fact that a plaintiff was unemployed at the time of his injury does not, in and of itself, preclude recovery for value of the time lost from the date of injury to trial. Accordingly, we find no error demonstrated in the giving of the above instruction.

Id. at 618-620, 325 N.E.2d at 848-849 (emphasis added).

The Fund emphasizes portions of the Rieth-Riley opinion which observed that damages cannot be awarded on the speculation, passion, or guess of the injury, and that evidence must be introduced which removes any award from the area of speculative damages. Indeed, here the trial court stated that "to find as a fact that [Schnelker] would have reentered the job market would simply be speculation on this Court's part." Appellant's Appendix at 9.

The court also found that Schnelker's testimony regarding his intent to return to work was "undercut by his deposition testimony." Id. at 8. The record reveals that the following exchange occurred during Schnelker's deposition:

14

Q.      . . . All right, let me show you Exhibit 2 from your request for the request for admissions that we've sent you. And this is a pension application form?

A.      Yes.

Q.      And can you tell, is that your handwriting on there (indicating)?

A.      That is my handwriting.

Q.      Okay. All right. And looks like the date of that is – is it September? Let's see.

A.      So that would be – should be –

Q.      Actually, yeah, the date –

[Schnelker's Counsel]:      That's the date it was received.

Q.      The date received is October 27, 2006 by Carday Associates, Inc., do you see that?

A.      That would be – yes.

Q.      Okay. And it says here the date you retired?

A.      9 – September 1 of '06.

Q.      Is that accurate?

A.      That would be.

Q.      All right. And so that was at the time where your employers were saying you got to make a decision here one way or another?

A.      Exactly.

Q.      And you decided when I combine the Social Security and the –

A.      I –

Q.      – disability benefits, I'm going to be pretty close to the same, and so I'm going to just go ahead and retire?

15

A.    Yes, sir.

Q.    Okay.  And at that point you knew you weren't going to be going back to work once you retired?

A.    Once I made this decision, I thought – yeah, you know.

Defendant's Exhibit B at 31.  The record also reveals that Schnelker applied for social security disability based upon his liver condition and was still receiving such payments at the time of the trial.  Further, Part I of Schnelker's pension application form indicated that he retired or planned to retire on September 1, 2006, and Part II indicated that he stopped working or planned to stop working on July 11, 2006 and that he was requesting an "early" pension.  Plaintiff's Exhibit 7.

Based upon our review of the record and under the circumstances, we cannot say that the trial court erred on this basis.  See also Atterholt v. Herbst, 902 N.E.2d 220, 224 (Ind. 2009) (holding that "if with proper care [the plaintiff] still had no chance of working in the future, no lost wages are recoverable from the Fund"), clarified on reh'g, 907 N.E.2d 528 (Ind. 2009).

II.

The next issue is whether the court erred in denying Schnelker damages for an increased risk of future physical harm.  Here, the trial court concluded that it was more likely than not that Schnelker would require two subsequent shoulder surgeries and awarded Schnelker $117,302.52 for future shoulder surgeries.  The court's order also stated: "The Court has declined to make an award for [Schnelker's] claim for damages for an increased risk of future physical harm, in that there has been a failure to prove

16

what expenses or injury were likely to be incurred beyond the award for future surgeries." Appellant's Appendix at 9.

Schnelker argues that the court failed to consider the risk of the increased physical harm should he develop a flail shoulder.[5] Schnelker requests that this court remand the issue to the trial court for a determination of damages with regard to the increased risk of future harm from a flail shoulder or other future physical harm. The Fund argues that the "trial court absolutely *considered* Mr. Schnelker's arguments regarding the need for future surgery and the potential risk of developing a 'flail shoulder' if future surgery is unsuccessful," and that Schnelker failed to prove that a flail shoulder was a likely outcome following the two future surgeries for which the court awarded damages. Appellee's Brief at 18. The Fund also argues that there is no expert testimony indicating that a future surgery was likely to yield unsuccessful results.

In his reply brief, Schnelker does not argue that he has experienced flail shoulder but argues that "the increased risk of future injury, in and of itself, is compensable as an element of one's general damages." Appellant's Reply Brief at 9. Thus, "the problem becomes one of identification and valuation or quantification of that injury." Alexander v. Scheid, 726 N.E.2d 272, 279 (Ind. 2000).

The parties point to the deposition of Dr. Frederick Kaplan in which the following exchange occurred:

---

[5] During his deposition, Dr. Frederick Kaplan provided the following description of shoulder flail: "one of the solutions, if it's felt to be non-reconstructible, is to basically remove the implants and leave the shoulder flail, so you no longer have any kind of stability at the joint. You have just taken everything out, and the patient would have what we call a flail shoulder. So no great stability and not great mobility." Plaintiff's Exhibit 4 at 48.

17

Q    . . . Is there anything about the replacement procedure which would be different, substantially different, than what he had to go through when the original procedure was conducted?

A    Potentially. It would be the potential – need for potential bone loss. Oftentimes in a revision-type surgery, there is nothing – what we call the bone stock or the normal bony anatomy is now different. You know, associated with loosening of well documented hips and knees is that there is – it's called osteolysis, which is the loss of bone around the implant. So – and one of the particular complications which is seen in this surgery specifically is something called scapular notching, which is as that now reversed ball and cup, as that cup rotates around that ball, if it impacts into the scapula or the shoulder blade, it can notch or what we call a bony change or erosion there, causing loosening of the hardware or potentially glenoid fracture. So potentially, depending on why it failed and you need to revise it, you could have bone loss or defects that you have to then use potentially an allograft for, which we didn't use an allograft on his primary. You may have fracture that you may then need to use plates or screws in order to secure, cables or other hardware in order to replace bone loss or make a stable construct again.

Q    Can there be a situation where there is sufficient bone loss that you simply can't do a revision at all?

A    There probably could be. I have no – honestly, I've never had to revise one of these myself. And, again, the literature of the United States, there is not – it's a limited life span, so I am not aware of a case that I've read about where – I guess, strike that, if that's the right term. You know, I can.

Q    You could amend it.

A    I amend it. As I've read about complications of this procedure, you know, one of the solutions, if it's felt to be non-reconstructible, is to basically remove the implants and leave the shoulder flail, so you no longer have any kind of stability at the joint. You have just taken everything out, and the patient would have what we call a flail shoulder. So no great stability and not great mobility.

Q    It sounds – when you use the word "flail," it sounds pretty bad. What could you do with that arm at that point?

18

A    Well, obviously what you would try to do, not do that initially, if you could. You know, so the initial goal would be to reconstruct the bone stock so that you could then put in a new prosthesis and do a revision surgery.

Q    But if you end up that you can't do that and you end up with a shoulder that flails –

A    Potentially. If you can't revise it, you could try to fuse the joint, but you probably do not have enough bone to work with. Otherwise you would be doing the replacement. So if you fuse the joint, you would still have a lot less bone to try to connect, and it probably would not be much better than a flailer.

Q    And, again, not to beat this horse too much, but when you say a flail arm, is it useful at all? If someone has that condition, really what can they do with that arm?

A    I said it more correctly the first time. A flail shoulder not a flail arm. The elbow would still be normal and hand and wrist would still be normal, normal feeling. It's just there would not be much mobility at the shoulder level or – and not much stability. Meaning that if you tried to do anything with the weight away from your body, there is nothing to kind of support that away from your body, and it's going to collapse.

Plaintiff's Exhibit 4 at 46-49.

Dr. Kaplan's deposition does not reflect that Schnelker presented evidence to quantitatively support his position that the alleged negligence was a substantial factor that contributed to an increased risk of harm of flail shoulder. Rather, Dr. Kaplan testified that he had never had to perform a revision and while he indicated that the literature presented the possibility of removing the implants resulting in shoulder flail, he did not describe the extent that the alleged negligence might have increased Schnelker's risk of shoulder flail. Under the circumstances, we cannot say that the trial court erred on this basis.

19

## III.

The next issue is whether the inclusion in the trial court's record of two letters sent by counsel for the Fund related to mediation between the Fund and Schnelker requires reversal. Schnelker argues that remand is necessary to address the issues of lost wages and/or lost earning capacity, and increased risk of future physical harm. The Fund concedes that "[a]s the [Fund's] counsel's staff prepared and copied the trial brief for filing, certain documents from the defense counsel's file somehow accompanied the trial brief to the trial court for filing," and argues that "[t]his clerical error was inadvertent and unintended." Appellee's Brief at 24. The Fund also argues that the production of the documents did not constitute an admission of the documents and that any error was harmless.

Initially, we observe that Ind. Alternative Dispute Resolution Rule 2.11 governs the confidentiality of mediation sessions and provides:

> Mediation shall be regarded as settlement negotiations as governed by Ind. Evidence Rule 408. For purposes of reference, Evid. R. 408 provides as follows:
>
> Rule 408. Compromise and Offers to Compromise
>
> *Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim, which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.*

> *Compromise negotiations encompass alternative dispute resolution.*

> Mediation sessions shall be closed to all persons other than the parties of record, their legal representatives, and other invited persons.

> Mediators shall not be subject to process requiring the disclosure of any matter discussed during the mediation, but rather, such matter shall be considered confidential and privileged in nature. The confidentiality requirement may not be waived by the parties, and an objection to the obtaining of testimony or physical evidence from mediation may be made by any party or by the mediators.

The improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment. D.W.S. v. L.D.S., 654 N.E.2d 1170, 1173 (Ind. Ct. App. 1995).  In a case tried before the bench, the harm caused by evidentiary error is lessened and we will reverse only when the court's judgment has apparently or obviously been infected by erroneously admitted evidence.  Marchal v. Craig, 681 N.E.2d 1160, 1163 (Ind. Ct. App. 1997).  When certain evidence is improperly admitted in actions tried to the trial court, it is presumed that the trial court disregarded all inadmissible evidence and weighed only the proper evidence in determining whether the plaintiff has carried his burden of proof.  654 N.E.2d at 1173-1174.

With respect to the letter addressed to the mediator, Schnelker argues that "the bulk of the correspondence sets forth a one-sided viewpoint and critique of [his] injury claim, and in particular the issues in dispute regarding the claim for lost wages/loss of earning capacity."  Appellant's Brief at 19.  However, Schnelker does not argue that this

letter contained any information that was not included in other properly submitted documents or develop an argument as to how this letter was prejudicial.

With respect to the letter addressed to the Indiana Department of Insurance, Schnelker points to the following portion: "[The mediator] told us that he would expect a judgment in this case to come in somewhere at $350,000.00 or less and would be 'stunned' if Judge Rosenberg awards more than $500,000.00." Appellant's Appendix at 86. Schnelker also points out that the letter stated that Schnelker's counsel might have been willing to accept $850,000 to settle this case, and argues, without citation to the record, that "such a revelation to the trial court could serve to undermine the request made by [Schnelker's] counsel at trial to award the maximum damages available to [Schnelker] by statute, an additional $1,000,000.00." Appellant's Brief at 21. Schnelker does not point to the transcript or the trial court's order and our review does not reveal that either letter was mentioned in the trial court's order or at trial. While the inclusion of the letters was improper and a violation of Alternative Dispute Resolution Rule 2.11, we cannot say that reversal is required.

For the foregoing reasons, we affirm the trial court's order

Affirmed.

BAKER, J., and KIRSCH, J., concur.