


FILED

Oct 22 2025, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Donna Wagner,

*Appellant-Plaintiff*

v.

Mark Christopher Perry, et al.,

*Appellees-Defendants*

---

October 22, 2025

Court of Appeals Case No.
25A-PL-674

Appeal from the Hamilton Superior Court

The Honorable William J. Hughes, Judge

Trial Court Cause No.
29D03-2302-PL-1942

---

**Opinion by Judge DeBoer**
Chief Judge Altice and Judge Pyle concur.

**DeBoer, Judge.**

## Case Summary

[1] This appeal arises from a series of lawsuits and arbitration proceedings against alleged joint tortfeasors sued in separate actions. At common law, a plaintiff may file a single lawsuit against one alleged joint tortfeasor without having to name all the parties who caused or contributed to their damages. *Ind. Dept. of Ins. v. Everhart*, 960 N.E.2d 129, 137 (Ind. 2012). But the Comparative Fault Act, Indiana Code chapter 34-51-2 (the CFA) abrogated this rule in "any action based on fault that is brought to recover damages for injury or death to a person or harm to property[.]" Ind. Code § 34-51-2-1(a). When the CFA applies, a plaintiff must "'name all alleged joint tortfeasors as defendants in one suit or face the possibility of being estopped from pursuing a remedy against the unnamed tortfeasor in a subsequent lawsuit.'" *Davidson v. State*, 211 N.E.3d 914, 923 (Ind. 2023) (quoting *Bornstein v. Watson's of Indianapolis, Inc.*, 771 N.E.2d 663, 667 (Ind. Ct. App. 2002)), *reh'g denied*.

[2] In 2019, Donna Wagner sued her late husband's insurance broker, Brian Simms, and Simms' insurance brokerage firm, the Brendanwood Companies,[1]

---

[1] Simms was associated with several Brendanwood entities, including Brendanwood Financial Brokerage, LLC and Brendanwood Financial Services, LLC. The parties to this appeal use "the Brendanwood Companies" to collectively and interchangeably refer to both of these entities, so we do the same.

alleging that they had stolen over $1.4 million from her. Wagner settled that lawsuit through the entry of an agreed judgment in the amount of $950,000.

[3] After Wagner obtained the agreed judgment, she was awarded additional damages in arbitration proceedings through the Financial Industry Regulatory Authority (FINRA)[2] against the Brendanwood Companies' Chief Operating Officer, Mark Perry, and Brokers International Financial Services, LLC (BIFS), an FINRA-registered securities brokerage firm Perry was associated with. However, Perry and BIFS filed an application with the Hamilton Circuit Court seeking to vacate that award on the basis that the FINRA arbitrators exceeded their authority.[3] The court agreed and vacated the award.

[4] After the arbitration award was vacated, Wagner filed the present lawsuit against Perry and BIFS. She alleged that Perry had "directly and indirectly participated in and benefitted from the theft and conversion of [her] money" and that he and BIFS were liable for "all of her losses[.]" Appellant's Appendix Vol. 4 at 210, 216. In an amended complaint, Wagner asserted causes of action for (1) theft and conversion; (2) breach of fiduciary duty; (3) negligent

---

[2] FINRA is a non-governmental, self-regulatory organization that regulates its members under the supervision of the U.S. Securities and Exchange Commission. *About FINRA*, FINRA, https://www.finra.org/about [https://perma.cc/XVU6-FTRS].

[3] Indiana Code section 34-57-2-13(a)(3) provides that "[u]pon application of a party, [a] court shall vacate an [arbitration] award where[] . . . the arbitrators exceeded their powers and the award can not [sic] be corrected without affecting the merits of the decision upon the controversy submitted[.]"

supervision; and (4) violations of the Indiana Uniform Securities Act, Indiana Code article 23-19 (the Securities Act).

[5] Perry and BIFS moved to dismiss these claims pursuant to Indiana Trial Rule 12(B)(6), arguing, among other things, that Wagner's amended complaint was barred by collateral estoppel because she failed to name them as defendants in the prior lawsuit. The trial court granted that motion to dismiss, reasoning that Wagner's "failure to name BIFS and Perry in the prior suit . . . r[an] afoul of" the CFA. Appellant's App. Vol. 2 at 27.

[6] Wagner now appeals that dismissal. We find that the CFA does bar her claims for theft and conversion, breach of fiduciary duty, and negligent supervision, and thus affirm the trial court's dismissal of those claims under *Davidson's* collateral estoppel analysis. However, because the Securities Act expressly retains common law joint and several liability—and the facts alleged in the amended complaint are sufficient to state a claim for relief under the act—we conclude that the court erred in dismissing Wagner's claim under the Securities Act. Accordingly, we affirm in part and reverse and remand in part.

## Facts and Procedural History

[7] Wagner and her husband were friends and long-time clients of Simms, who owned and was the highest-ranking officer of the Brendanwood Companies. Simms sold Wagner's husband various annuities and life insurance policies, from which Wagner received over $1 million in benefits after her husband's death in 2017. She turned to Simms for guidance on how to invest these and

other funds, and Simms told her that he would have an employee of the Brendanwood Companies, Kristin Metzel, prepare a financial analysis to aid Wagner in deciding how to allocate her investments.[4]

[8] The analysis Metzel prepared for Wagner indicated that the Brendanwood Companies had "determined that [her] desired portfolio should be structured with **94.00%** of [her] funds invested in low risk [sic] assets [and] **6.00%** . . . invested in at risk [sic] assets[.]" Appellant's App. Vol. 4 at 222 (emphasis in original). Relying on this recommendation, Wagner gave the Brendanwood Companies over $1.4 million to fund the proposed portfolio.

## Lawsuit Against Simms and the Brendanwood Companies

[9] In December 2019, after hiring counsel to investigate inconsistencies in account statements provided to her by Simms, Wagner filed a complaint against him and the Brendanwood Companies. She alleged that Simms had "use[d] Brendanwood [] as his own conduit or ATM machine to obtain significant funds from [her] and convert those funds for his or others['] own personal use and consumption all under the guise of a purported insurance and investment

---

[4] Though Metzel worked full-time for the Brendanwood Companies, she was simultaneously registered as a representative of BIFS.

strategy[.]"[5]  Appellant's App. Vol. 2 at 114.  She further alleged that Perry was "complicit with Simms' conduct" and that the Brendanwood Companies had a history of "financial issues related to [] Simms, [] Perry[,] and even [] Metzel." *Id.*  However, neither Perry, Metzel, nor BIFS were named as defendants in that complaint.

[10]  The following year, in December 2020, the Hamilton Circuit Court issued an agreed judgment which provided, in part, as follows:

> 2.  [Wagner], [] Simms, and the Brendanwood [Companies] in lieu of further prosecution of this matter and trial by jury have submitted all remaining matters in controversy, both factual and legal to the Court[.]
>
> 3.  All claims and causes of action asserted in [Wagner's] Complaint . . . and all defenses asserted in the Answer filed by Simms and the Brendanwood [Companies], including any claims that were or could have been asserted between the parties have been resolved.  This judgment is entered by agreement of the parties, including by agreement of [] Simms individually and . . . as the CEO of [the Brendanwood Companies].

---

[5] In September 2022, a federal grand jury returned an indictment to the United States District Court for the Southern District of Indiana under Case No. 1:22-CR-00133-001 charging Simms with various crimes stemming from allegations that he falsely led several Brendanwood Companies customers to believe their funds were being invested into annuities and other insurance products.  According to that indictment, Simms used these customers' funds "for his own personal expenditures or to pay other [v]ictim [i]nvestors in an attempt to conceal the scheme[.]"  Appellant's App. Vol. 4 at 76.  In 2024, Simms was convicted of one count of Wire Fraud in violation of 18 United States Code section 1343 and was sentenced to the custody of the United States Bureau of Prisons for a term of ninety months, followed by three years of supervised release.

It Is Therefore Ordered that Judgment be entered in favor of . . .
Wagner and against . . . Simms [and the Brendanwood
Companies] in the amount of [$950,000]. . . .

This Agreed Judgment shall be entered into the Court's
[Chronological Case] Summary and the Judgment Docket and
[Wagner] shall be entitled to any processes necessary in the
enforcement of this Judgment.

*Id.* at 125-26.

## FINRA Arbitration Against Perry and BIFS

[11] On the same day she filed her complaint against Simms and the Brendanwood Companies, Wagner submitted a claim to FINRA[6] against Perry and BIFS.[7] The claim alleged that Perry participated in the scheme to steal her funds and that BIFS had breached FINRA's rules, violated various provisions of federal

---

[6] FINRA requires its members to arbitrate any dispute that "arises in connection with the[ir] business activities" if "(1) [r]equired by a written agreement, or (2) [r]equested by the customer[.]" *12200. Arbitration Under an Arbitration Agreement or the Rules of FINRA*, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12200 [https://perma.cc/7H5M-H7KJ]. During the FINRA arbitration process, a customer's claim is submitted to a panel of three arbitrators, who receive evidence from the parties at a formal hearing before issuing a decision referred to as "the arbitration award[.]" *FINRA's Arbitration Process*, FINRA, https://www.finra.org/arbitration-mediation/about/arbitration-process [https://perma.cc/DC56-DC5Y]. If the arbitrators grant the customer a monetary award, the FINRA member may file a motion to vacate the arbitration award "with a court of competent jurisdiction." *12904. Awards*, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12904 [https://perma.cc/6KK9-BGRJ].

[7] Perry and BIFS assert that Wagner filed her FINRA claim "[a]fter obtaining the [a]greed [j]udgment in the first lawsuit[.]" Appellees' Brief at 6. But she in fact filed the FINRA claim on December 2, 2019, over one year before the Hamilton Circuit Court issued the agreed judgment on December 17, 2020.

and Indiana law, and failed to properly supervise Perry and Simms.[8]  In May 2021, a panel of three FINRA arbitrators issued an award finding Perry and BIFS "jointly and severally liable" and ordering them to pay Wagner "$795,929.00 in compensatory damages."  Appellant's App. Vol. 3 at 219.  The award also assigned the agreed judgment against Simms and the Brendanwood Companies to Perry and BIFS.

[12]  Perry and BIFS filed an application to vacate the arbitration award with the Hamilton Circuit Court.  They argued that Wagner was not a "customer" as that term is defined by FINRA's rules and that, consequently, the arbitrators lacked authority to hear her claim.  The court agreed and issued an order vacating the arbitration award.  In doing so, it reasoned:

> 4.       . . . In order to be a customer under the [r]ule's provisions, one has to open an account with the member firm or buy and sell securities or brokerage services through the member firm or its associated person. . . . Wagner argue[s] that she had a subjective belief that she was a customer of [Perry and BIFS], but the Court finds this alleged subjective belief immaterial[.]
>
> * * *
>
> 7.       [Wagner] did not purchase anything from either [Perry or BIFS] nor from third party Metzel.  She never discussed

---

[8] Whether, and to what extent, Simms may have been associated with BIFS is not clear from the record before us.

securities with any of them and had not even heard of [] BIFS until the FINRA arbitration commenced.

8.      Instead, [she] purchased fixed insurance products from a third party, [] Simms, who absconded with [her] funds.

9.      There is no evidence before the Court that Simms was a registered representative of or affiliated with [] BIFS.

* * *

11.      Further, the dispute between . . . Wagner and [Perry and BIFS] did not arise in connection with [their] business activities[.]

12.      Therefore, the Court finds that . . . Wagner's claims are not subject to FINRA arbitration, and the arbitrators exceeded their powers[.]

Appellant's App. Vol. 4 at 71-72.

**Lawsuit Against Perry and BIFS**

After the Hamilton Circuit Court vacated the arbitration award, Wagner filed the present lawsuit against Perry and BIFS. In her amended complaint, she alleged that she had been "unable to collect upon [the] judgment" against Simms and the Brendanwood Companies. *Id.* at 210. She further alleged that "Perry . . . directly and indirectly participated in and benefitted from the theft and conversion of [her] money" and that he and BIFS were liable for "all of her losses[.]" *Id.* at 210, 216. She asserted causes of action for theft and conversion

against Perry;[9] negligent supervision against BIFS; and violations of the Securities Act against both.

[14] Perry and BIFS moved to dismiss the amended complaint pursuant to Indiana Trial Rule 12(B)(6), arguing, in part, that Wagner's claims were barred by the doctrines of res judicata and collateral estoppel. Specifically, they asserted that the amended complaint was "based on the same nucleus of facts as the case that was already[] adjudicated against . . . Simms" and was "also barred by the factual findings in" the order vacating "the prior FINRA award." Appellant's App. Vol. 5 at 5.

[15] After a hearing on the motion to dismiss, the trial court entered an order dismissing the amended complaint with prejudice. It reasoned that while Wagner's claims were not barred by res judicata, her

> failure to name BIFS and Perry in the prior suit [against Simms and the Brendanwood Companies] r[an] afoul of . . . the [CFA][.] ["]The [CFA] requires the trial court to apportion 100 percent of fault for both parties and nonparties[.] . . . The result is that a single action under the [CFA] necessarily adjudicates all the liability and damages for the plaintiff's injury.["] . . . *Davidson*[,] 211 N.E.3d [at] 921-22[.]

---

[9] The amended complaint also alleged that Perry had engaged "in a civil conspiracy" to convert Wagner's funds. Appellant's App. Vol. 2 at 212. However, "[c]ivil conspiracy is not an independent cause of action[,]" but rather "just another way of asserting a concerted action in the commission of a tort[,]" in this case, conversion. *Birge v. Town of Linden*, 57 N.E.3d 839, 846 (Ind. Ct. App. 2016) (quoting *Boyle v. Anderson Fire Fighters Ass'n Local 1262*, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986), *reh'g denied, trans. denied*).

* * *

> *Davidson's* collateral-estoppel [sic] analysis applies to all four counts of [the] amended complaint, requiring that all four counts alleged in this suit are barred based on collateral estoppel.

Appellant's App. Vol. 2 at 27. Wagner now appeals.

## Discussion and Decision

## 1. Standard of Review

We review an Indiana Trial Rule 12(B)(6) order of dismissal de novo, giving no deference to the trial court's decision. *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 774 (Ind. 2024). A 12(B)(6) motion "'tests the legal sufficiency of a complaint: that is, whether the allegations in the complaint establish any set of circumstances under which a plaintiff would be entitled to relief.'" *Safeco Ins. Co. of Ind. v. Blue Sky Innovation Grp., Inc.*, 230 N.E.3d 898, 901 (Ind. 2024) (quoting *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 134 (Ind. 2006)), *reh'g denied*. In reviewing the challenged complaint, we take all facts alleged as true and draw all inferences in the non-moving party's favor. *Kelly v. Ind. Bureau of Motor Vehicles*, 260 N.E.3d 934, 937-38 (Ind. 2025). We will affirm an order to dismiss "when it is 'apparent that the facts alleged in the challenged pleading are incapable of supporting relief under any set of circumstances.'" *Safeco Ins. Co. of Ind.*, 230 N.E.3d at 902 (quoting *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 65 (Ind. Ct. App. 1999), *trans. denied*).

## 2. Collateral Estoppel

On appeal, Wagner argues that the trial court erred in concluding that the agreed judgment against Simms and the Brendanwood Companies bars her claims against Perry and BIFS under the doctrine of collateral estoppel.

Collateral estoppel—also referred to as issue preclusion—is a preclusive doctrine that "bars relitigating the same fact or issue when that fact or issue was necessarily decided in a prior lawsuit by a court of competent jurisdiction." *Davidson*, 211 N.E.3d at 921. Three elements must be satisfied for the doctrine to apply: "(1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of the party in the prior action." *Nat'l Wine & Spirits v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012), *reh'g denied*, *cert. denied*. In addition to these elements, courts examine two additional "salient considerations—(a) 'whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue,' and (b) 'whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel.'" *Miller v. Patel*, 212 N.E.3d 639, 647 (Ind. 2023) (quoting *Nat'l Wine & Spirits*, 976 N.E.2d at 704).

Here, there is no dispute that Wagner was a party to her lawsuit against Simms and the Brendanwood Companies, so we focus our analysis on the remaining collateral estoppel considerations.

## A. Final Judgment on the Merits

[20] A "final judgment[] dispose[s] of the subject matter of the litigation as to the parties so far as the court in which the action is pending has the power to dispose of it." *Reising v. Guardianship of Reising*, 852 N.E.2d 644, 649 (Ind. Ct. App. 2006). Wagner argues that because her lawsuit against Simms and the Brendanwood Companies was resolved by an agreed judgment, it was not "concluded by a 'final judgment on the merits.'" Appellant's Brief at 19 (quoting *Miller*, 212 N.E.3d at 646). We disagree.

[21] Though we agree with Wagner that Indiana's appellate courts have long held "[a] consent decree is not a judicial determination" and "does not purport to represent the judgment of the court," we note that in recognizing these principles, our Supreme Court also expressed that the fact a "judgment was rendered by consent of the parties does not detract from its dignity, *or lessen its conclusiveness as an adjudication between the parties*[.]" *State v. Huebner*, 104 N.E.2d 385, 387-88 (Ind. 1952) (emphasis added). This is a long-standing rule under Indiana law that was first recognized by the Court in 1892:

> [T]he question in this case is as to whether or not, when all of the parties are in court and enter into an agreement that such a decree shall be entered, and it is entered in pursuance of such agreement, is such a decree valid, and does it bind the parties to the judgment? We think it is valid, and does bind the parties.

*Indianapolis, D. & W. Ry. Co. v. Sands*, 32 N.E. 722, 725 (Ind. 1892).

[22] In fact, a more recent panel of this Court—relying on both *Huebner* and *Sands*—found that an agreed judgment was conclusively binding on a party who entered into it and was thus final and not reviewable on appeal. *Gallops v. Shambaugh Kast Beck & Williams, LLP*, 56 N.E.3d 59, 62 (Ind. Ct. App. 2016), *trans. denied*. In that case,

> there [was] nothing explicit in the agreed judgment concerning an appeal of any issues after entry of the agreed judgment. Indeed, the only language referring to the effect of the entry of the agreed judgment [was] that it would be entered on the trial court's docket "as a final judgment" and that the "judgment will have the same effect as if the case had proceeded to trial, as it is presently postured, a verdict had been arrived at by a jury on all presently pending claims, and the [c]ourt had then entered judgment[.]"

*Id.* at 64.

[23] Similarly, here, the language used by Wagner, Simms, and the Brendanwood Companies in the agreed judgment leaves no room for doubt that they intended for it to be a final judgment. Specifically, the parties stated their desire to "submit[] all remaining matters in controversy, both factual and legal[,] to the Court[.]" Appellant's App. Vol. 2 at 125. They further agreed that the judgment would resolve "[a]ll claims and causes of action" between the parties, including not only the causes of action expressly asserted by Wagner in her complaint, but also "all defenses asserted in the Answer filed by Simms and the Brendanwood [Companies]" and "any claims that were or could have been asserted between the parties[.]" *Id.* at 125-26. And they agreed that the

"Judgment shall be entered into the . . . Judgment Docket and [Wagner] shall be entitled to any processes necessary in the enforcement of [the] Judgment." *Id.* at 126. It would be nonsensical to conclude, then, that the agreed judgment was not a final judgment even though it disposed of "all issues as to all parties, thereby ending the [] case[.]" *In re S.L.*, 210 N.E.3d 1280, 1283 (Ind. 2023) (quoting *Georgos v. Jackson*, 790 N.E.2d 448, 451 (Ind. 2003), *reh'g denied*); *see also* Ind. Appellate Rule 2(H)(1) (defining a final judgment as one that "disposes of all claims as to all parties").

[24] We are not persuaded by Wagner's assertion that an agreed judgment like the one at issue here is not final for collateral estoppel purposes because "[o]ne would struggle to conceptualize a characteristic more wedded to the notion of a 'final judgment on the merits' than a party's ensuing right of appeal." Appellant's Br. at 23. To support this contention, Wagner cites *S.L.*, where our Supreme Court held that an order granting temporary custody in an adoption proceeding was not a final appealable order under Indiana Appellate Rule 2(H)(1). 210 N.E.3d at 1283. Wagner is incorrect in her assertion that *S.L.* requires that a judgment must be appealable to be final. Though the temporary custody order in *S.L.* was not appealable because it was not final, the Court made clear that what renders a judgment final is not that it can be reviewed on appeal, but rather that it "disposes 'all issues as to all parties, thereby ending the particular case[,]' and 'leaves nothing for future determination.'" *Id.* (quoting *Georgos*, 790 N.E.2d at 451).

Indeed, the Court's opinion in *Miller* suggests that agreed judgments *are* final judgments on the merits for collateral estoppel purposes. There, the Court recognized that "entered plea agreements are final judgments on the merits" because they "effectively determine 'the rights of the parties in the suit[.]'" *Miller*, 212 N.E.3d at 648 (quoting *Watford v. State*, 384 N.E.2d 1030, 1033 (Ind. 1979)). Likewise, here, Wagner, Simms, and the Brendanwood Companies resolved all claims and defenses pending in the prior action. Accordingly, the agreed judgment is no less final than had it been issued by the trial court in ruling on a contested dispositive motion or after trial. *See Huebner*, 104 N.E.2d at 388 ("That the judgment was rendered by consent of the parties does not detract from its dignity, or lessen its conclusiveness as an adjudication between the parties[.]").

## B. Identity of the Issues

Where a final judgment has been entered in a prior proceeding, "[t]he 'identity of the issues' requirement of the collateral-estoppel [sic] doctrine is met when an issue that was necessarily adjudicated in the prior proceeding is the same issue presented in the subsequent lawsuit." *Nat'l Wine & Spirits, Inc.*, 976 N.E.2d at 706. Here, the trial court concluded that when Wagner filed suit against Simms and the Brendanwood Companies, the CFA required her to name all joint tortfeasors who caused or contributed to her damages in that action. Because she failed to name Perry or BIFS, the court concluded that the agreed judgment implicitly assigned one hundred percent of the fault for her damages to Simms and the Brendanwood Companies, preventing her from later pursuing claims

against Perry and BIFS. *See Davidson*, 211 N.E.3d at 923 (holding that "when a plaintiff fails to name a potential defendant in an action under the [CFA], . . . [she] 'loses' against the unnamed defendant by failing to obtain an allocation of fault against that defendant"). Thus, whether the court correctly found an identity of the issues hinges on whether the CFA applies under these circumstances.

[27] Under Indiana's "common law, joint tortfeasors were jointly and severally liable for the indivisible harm they caused a plaintiff." *Everhart*, 960 N.E.2d at 137. Under traditional joint and several liability principles, a plaintiff's recovery against one joint tortfeasor did not bar recovery against others. *See Am. Exp. Co. v. Patterson*, 73 Ind. 430, 436 (1881) ("Separate actions may be prosecuted at the same time against the respective parties charged with the same wrong, and separate verdicts and judgments taken against them[.]"); *Westfield Gas & Milling Co. v. Abernathey*, 35 N.E. 399, 400-01 (Ind. App. 1893) ("Persons who have jointly committed one and the same wrong may be sued jointly or severally, and, whether sued jointly or severally[,] their liability is always several.").

[28] However, as was explained by our Supreme Court in *Everhart*, "the [l]egislature altered this landscape when it passed the [CFA]." 960 N.E.2d at 138. Under the CFA, the fact-finder must "allocate a percentage of responsibility for the plaintiff's injuries to each defendant and any nonparty who contributed to those

injuries, and each defendant need only pay his proportional share." *Id.* The Court further clarified in *Davidson* that

> [b]y establishing a system that apportions all liability and damages in the same lawsuit, the [CFA] functionally requires plaintiffs to name all defendants in a single suit. Otherwise, serial suits against different tortfeasors in connection with the same injury could lead to inconsistent judgments. . . . The [CFA] does not countenance such inconsistencies. Tort claimants in a later lawsuit are thus foreclosed from recovering from tortfeasors omitted from the first lawsuit.

211 N.E.3d at 922.

But the rule expressed in *Davidson* does not apply to *all* causes of action against joint tortfeasors; as was noted by a panel of this Court in *Dallas v. Cessna*, the CFA "abrogat[es] the old rule of joint and several liability *in suits to which [it] applies.*" 968 N.E.2d 291, 298 (Ind. Ct. App. 2012) (emphasis added). In the present case, Wagner contends that "[a]pplication of the [CFA] here . . . would require this Court to . . . expand the [act] beyond the clear parameters" it sets out. Appellant's Br. at 33. We disagree with Wagner's reading of the CFA.

In interpreting the CFA, as with any other statute, "'our goal is to determine and give effect to' the legislature's intent." *Town of Linden v. Birge*, 204 N.E.3d 229, 237 (Ind. 2023) (quoting *State v. Int'l Bus. Machs. Corp.*, 964 N.E.2d 206, 209 (Ind. 2012)). To ascertain the legislature's intent, we read the statute's "words in their plain and ordinary meaning" unless otherwise defined. *Id.* The CFA applies only to an "action based on fault that is brought to recover

damages for injury or death to a person or harm to property[.]" I.C. § 34-51-2-1(a). We address these requirements, *i.e.*, (1) an action based on fault (2) to recover certain damages, in reverse order.

### i. Wagner's Damages

[31] Wagner argues the CFA does not apply because in her amended complaint, she sought "purely economic losses" which were not a harm to property within the meaning of Indiana Code section 34-51-2-1(a). Appellant's Br. at 33. We disagree.

[32] The CFA does not define the phrase "harm to property" as used in section 34-51-2-1(a) and the parties have not cited—nor have we found—any prior decision in which an Indiana appellate court has construed its meaning. We note, however, that our Supreme Court has interpreted the phrase "damage to property" in a provision of the Indiana Tort Claims Act that defines "[l]oss" as an "injury to or death of a person or damage to property." I.C. § 34-6-2.1-117(a) (formerly I.C. §§ 34-6-2-75(a) (repealed 2025), 34-4-16.5-2(e) (repealed 1998)). In *Holtz v. Bd. of Com'rs of Elkhart Cnty.*, the Court held that "property," as used in the Tort Claims Act, includes "everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate." 560 N.E.2d 645, 647 (Ind. 1990) (quoting *Black's Law Dictionary* (5th ed. 1979)). With this broad definition of property, the Court reasoned "that the only logical interpretation to place upon the term 'loss' in the

statutory definition is to find that the legislature clearly intended to include all torts committed against either persons or property[,]" which encompasses damages caused by "(1) a direct invasion of some legal right of the individual; (2) the infraction of some public duty by which special damage accrues to the individual; [or] (3) the violation of some private obligation by which like damage accrues to the individual." *Id*. at 647-48 (quoting *Black's*, *supra*).

[33] Because the phrase "damage to property" in Indiana Code section 34-6-2.1-117(a) is substantively identical to the phrase "harm to property" in section 34-51-2-1(a), and because the Tort Claims Act and the CFA are concerned with relative subject matter—*i.e.,* actions to recover damages to person or property—we are persuaded that the legislature intended for the phrases to carry the same meaning under both acts. *See Gierek v. Anonymous 1*, 250 N.E.3d 378, 388 n.4 (Ind. 2025) (quoting *Haynes Auto. Co. v. City of Kokomo*, 114 N.E. 758, 759 (Ind. 1917)) (observing that "the search for legislative intent may require us to 'look . . . to other statutes upon the same subject or relative subjects'").

[34] Thus, we hold that the CFA applies to any action based on fault that seeks to recover damages for a harm to property, with "harm to property" carrying the same broad meaning as "damage to property" defined by the Court in *Holtz*. Here, Wagner alleged that Perry and BIFS's tortious actions contributed to her loss of over $1.4 million stolen from her by Simms, so she necessarily brought an action to recover damages for harm to property within the meaning of the CFA.

### ii. Wagner's Causes of Action

[35] Because Wagner's amended complaint sought damages for harm to property within the meaning of the CFA, we next turn to whether the specific causes of action she asserted to recover those damages constitute an "action based on *fault*" as defined by the CFA. I.C. § 34-51-2-1(a) (emphasis added). "Fault" under the CFA "includes any act or omission that is negligent, willful, wanton, reckless, or intentional toward the . . . property of others." I.C. § 34-6-2.1-68(b) (formerly I.C. § 34-6-2-45(b) (repealed 2025)).

[36] We find that Wagner's claims for conversion, breach of fiduciary duty, and negligent supervision each fall within this definition, as they sound in tort, are based on intentional or negligent conduct, and seek to recover property damage. *See Ind. & Mich. Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 610 (Ind. Ct. App. 1987) ("Conversion is a tort involving the appropriation of personal property of another person to the tortfeasor's own use and benefit[.]"), *reh'g denied*, *trans. denied*; *Bacompt Sys., Inc. v. Ashworth*, 752 N.E.2d 140, 145 (Ind. Ct. App. 2001) ("[T]he cause of action for breach of fiduciary duty . . . is considered a tort claim for injury to personal property."), *trans. denied*; *Cruz v. New Centaur, LLC*, 150 N.E.3d 1051, 1059 (Ind. Ct. App. 2020) (quoting *Clark v. Aris, Inc.*, 890 N.E.2d 760, 765 (Ind. Ct. App. 2008), *trans. denied*) (defining negligent supervision as a tort that imposes liability "on an employer when an employee 'steps beyond the recognized scope of his employment to commit a tortious injury upon a third party.'").

[37] The same is not true, however, regarding Wagner's claim for violations of the Securities Act. Because the CFA is a statutory creation that abrogates common law joint and several liability, the legislature is empowered to exclude certain causes of action from the comparative fault analysis. *Santelli v. Rahmatullah*, 993 N.E.2d 167, 178 (Ind. 2013) ("The Indiana legislature has the authority to expressly permit joint and several liability[.]"), *reh'g denied*; *see, e.g.*, *Everhart*, 960 N.E.2d at 138 (citing I.C. § 34-51-2-1(b)(1) (2008)) ("Because the [CFA] expressly exempted medical malpractice claims from its ambit . . . the historical rule of joint and several liability would appear to still apply[.]").

[38] We find that the legislature did just that in enacting the Securities Act, which creates a statutory right of action available to a purchaser against a "person [who] sells a security in violation of" it. I.C. § 23-19-5-9(a). It further provides that certain "persons are liable *jointly and severally* with and to the same extent as" someone who violates the act, including:

> (1) A person that directly or indirectly controls [the violator][.]
>
> (2) An individual who is a managing partner, executive officer, or director of [the violator] . . . , including an individual having a similar status or performing similar functions[.]
>
> (3) An individual who is an employee of or associated with [the violator] and who materially aids the conduct giving rise to the liability[.]

(4) A person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the [violator's] liability[.]

I.C. § 23-19-5-9(d) (emphasis added). We agree with Wagner that because this provision expressly holds certain persons jointly and severally liable, the Securities Act "specifically preserves the old rule of joint and several liability[.]" Appellant's Reply Br. at 21. Accordingly, the trial court erred when it concluded that Wagner's Securities Act claim was subject to *Davidson's* comparative fault collateral estoppel analysis.

## C. Full and Fair Opportunity to Litigate the Issue

[39] Wagner contends that even if the CFA applies to some or all her claims in this action, we should nonetheless decline to apply collateral estoppel. She argues that her lawsuit against Simms and the Brendanwood Companies "did not present a practical opportunity to litigate the issues alleged in the instant case[,]" though she concedes that her claims against Perry and BIFS "share a common nucleus of operative fact" as the prior lawsuit. Appellant's Br. at 21, 25. Nonetheless, according to Wagner, "[t]he crux of the issues presented in the [prior] [a]ction was the actual misappropriation of [her] funds by [] Simms[,]" while, in "contrast, the central issue in the present action is [Perry and BIFS's] conduct which allowed for and[] facilitated that misappropriation." *Id.* at 25-26.

[40] This argument fails under *Davidson*, which held that "a single action under the [CFA] necessarily adjudicates *all* the liability and damages for the plaintiff's alleged injury." 211 N.E.3d at 922 (emphasis added). By excluding Perry and BIFS from the prior lawsuit, Wagner "implicitly allocated 'one hundred percent'" of the fault for her damages to Simms and the Brendanwood Companies for any claim subject to the CFA. *Id.* at 927 (Goff, J., concurring) (quoting I.C. § 34-51-2-7(b)(1)). "Thus, [Wagner] really did 'lose' on the issue of whether" any fault should be apportioned to Perry or BIFS. *Id.* at 923.

[41] Wagner's opportunity to apportion any fault to Perry or BIFS passed when she entered into the agreed judgment because she was "'obliged to name all alleged joint tortfeasors as defendants in one suit[.]'" *Id.* (quoting *Bornstein*, 771 N.E.2d at 667). She failed to do so, even though her prior complaint repeatedly referenced Perry's alleged complicity in Simms' conduct and—as evidenced by her FINRA claim filed contemporaneously with that complaint—she believed both Perry and BIFS had contributed to her damages. Consequently, she *did* have a full and fair opportunity to name Simms, the Brendanwood Companies, Perry, and BIFS in one action, but she declined to do so.[10] *See Davidson*, 211 N.E.3d at 924 (reasoning plaintiff had opportunity to name subsequently-sued

---

[10] Indeed, we agree with the trial court that "Wagner plainly could have sued BIFS and Perry in that first suit, but she initiated a[n] FINRA arbitration against them instead, without also naming them in the prior suit." Appellant's App. Vol. 2 at 27.

defendant in first action because she "was able to discover the defendants through reasonable, diligent investigation before obtaining a judgment").

### D. Fairness

[42] For the same reasons that we conclude Wagner had a full and fair opportunity to include Perry and BIFS in the prior action, we find that it would not be unfair to apply collateral estoppel. In *Davidson*, the Court reasoned that because the plaintiff filed a tort-claims notice against a state agency months before she filed a suit against a different defendant, it was not unfair to apply collateral estoppel when she subsequently attempted to sue the agency. *Id.* This was because "when [the plaintiff] served her tort-claim notice, she had 'reasonable cause to believe the existence'" of the agency's tortious acts. *Id.* at 925 (quoting T.R. 11). Likewise, here, at the same time Wagner sued Simms and the Brendanwood Companies, she not only mentioned Perry by name in the complaint but submitted a claim to FINRA against Perry and BIFS seeking to recover the same damages. We agree with Perry and BIFS that when she filed the prior lawsuit, she "was aware of who [Perry and BIFS] were and [the] possible alleged connection[] they had to Simms[.]" Appellees' Br. at 24.

[43] Wagner nonetheless argues that it would be unfair to bar her claims against Perry and BIFS because the FINRA arbitration "went very well for her . . . [a]lthough th[e] award would eventually be vacated on the basis that arbitration was improper[.]" Appellant's Br. at 30. But to agree with this argument would require us to sanction her attempt to litigate this matter in a piecemeal fashion,

which we decline to do in light of the guidance from our Supreme Court that one of the primary purposes of the CFA is to avoid "serial suits against different tortfeasors in connection with the same injury [that] could lead to inconsistent judgments." *Davidson*, 211 N.E.3d at 922.

[44] We are further convinced that the application of collateral estoppel here is not unfair given Wagner's concession that this piecemeal litigation was *not* "an inadvertent error or mistake[,]" but was rather part of her deliberate strategy "to pursue Simms via the standard avenue of litigation and [Perry and BIFS] though arbitration[.]" Appellant's Br. at 29. We agree with Perry and BIFS that because Wagner has already "had two bites at the apple" and effectively lost against Perry and BIFS both times, "[i]t would be unfair to allow [her] to continue litigating . . . until she obtains a favorable judgment." Appellees' Br. at 24.

\* \* \*

[45] For these reasons, the trial court correctly determined that *Davidson's* collateral estoppel analysis bars Wagner's claims against Perry and BIFS for conversion, breach of fiduciary duty, and negligent supervision. The court erred, however, in concluding the same as to her claim for violations of the Securities Act, because that act retains common law joint and several liability for joint tortfeasors.

Because the trial court erroneously concluded that Wagner's cause of action for violations of Securities Act was barred by *Davidson*, it did not reach the issue of whether the amended complaint contains allegations sufficient to state a claim under the act. Even so, we may affirm a 12(B)(6) order of dismissal "on any basis found in the record." *City of South Bend v. Century Indem. Co.*, 821 N.E.2d 5, 9 (Ind. Ct. App. 2005), *clarified on reh'g by* 824 N.E.2d 794 (2005), *trans. denied*. Thus, we turn to the issue of whether dismissal of Wagner's Securities Act claim was warranted for failure to state a claim.

## 3. The Securities Act

In their motion to dismiss, Perry and BIFS argued that Wagner's amended complaint failed to state a claim for a violation of the Securities Act because she failed to allege that they "committed any act in violation of the statute." Appellant's App. Vol. 5 at 17. They echo this argument on appeal, contending that Wagner "purchase[d] **fixed insurance annuity products**" which are "specifically exclude[d]" from the Securities Act.[11] Appellees' Br. at 33 (emphasis in original). In reply, Wagner posits that this argument "wade[s] into questions of fact[.]" Appellant's Reply Br. at 25. We agree with Wagner.

---

[11] A "[s]ecurity" as defined by the Securities Act "does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable sum of money either in a lump sum or periodically for life or another specified period[.]" I.C. § 23-19-1-2(28)(B).

The amended complaint alleges that "[t]he Brendanwood Companies . . . solicited a purchase by [Wagner] of various financial products[.]" Appellant's App. Vol. 4 at 214. In so doing, "the Brendanwood Companies . . . made material misrepresentations of fact . . . , including but not necessarily limited to the extent of her investable assets, the usage of her funds, and the expected returns she would achieve[.]" *Id.* Critically, the amended complaint does not explicitly state what these financial products were, let alone, as Perry and BIFS contend, that they were "fixed insurance annuity products." Appellees' Br. at 33 (emphasis omitted). The only specifics provided by the amended complaint regarding the alleged "financial products" was that they included "investments falling within the meaning of a 'security' as defined under the [] Securities Act." Appellant's App. Vol. 4 at 214. Thus, we cannot say, looking only to the facts alleged in the amended complaint and drawing all reasonable inferences in Wagner's favor, that the alleged "financial products" were not securities within the meaning of the Securities Act.[12]

---

[12] The term "[s]ecurity" under the Securities Act is broad and includes

> a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest therein or based on the value thereof; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

I.C. § 23-19-1-2(28).

[49] Nor do we agree with Perry and BIFS that the amended complaint fails to allege that they committed any act that would give rise to liability under the Securities Act. We acknowledge that the amended complaint fails to "referenc[e] the particular section that [they] allegedly violated." Appellant's App. Vol. 5 at 17. But under Indiana's notice pleading rules, "although highly desirable, a precise legal theory in a pleading . . . is not required." *ResCare Health Servs., Inc. v. Ind. Fam. & Soc. Servs. Admin. – Off. of Medicaid Pol'y and Plan.*, 184 N.E.3d 1147, 1153 (Ind. 2022) (quoting *Bayer Corp. v. Leach*, 147 N.E.3d 313, 315 (Ind. 2020)) (internal quotation marks omitted). All a plaintiff must do to sufficiently state a claim is "'plead the operative facts necessary to set forth an actionable claim.'" *Id.* (quoting *Trail v. Boys and Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 135 (Ind. 2006)).

[50] Wagner has stated operative facts sufficient to set forth an actionable claim against Perry and BIFS under the Securities Act. As discussed in Section 2(B)(ii), *supra*, the Securities Act imposes joint and several liability not only on persons who violated the act directly, but also on any person who, as pertinent here, (1) directly or indirectly controls or (2) is an executive officer of an individual or organization that did so. I.C. § 23-19-5-9(d)(1)-(2). The amended complaint alleged that Perry is an executive officer of the Brendanwood Companies, which sold securities to Wagner in violation of the Securities Act. It further alleged that given its supervisory relationship over Perry and Metzel, BIFS "enjoyed indirect control of the Brendanwood Companies[.]" Appellant's App. Vol. 4 at 215. These allegations are sufficient to state a claim against

Perry and BIFS under Indiana Code section 23-19-5-9, rendering dismissal of Wagner's Securities Act claim improper under Trial Rule 12(B)(6).[13]

## Conclusion

For these reasons, we conclude that the trial court properly dismissed Wagner's claims for theft and conversion, breach of fiduciary duty, and negligent supervision but erred in dismissing her claim for violations of the Securities Act. Accordingly, we affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

Affirmed in part and reversed and remanded in part.

---

[13] Perry and BIFS argue on cross-appeal that the trial court erred in declining to "take judicial notice of the exhibits [they] filed in support of" their motion to dismiss. Appellees' Br. at 34. After Perry and BIFS filed the motion, the court entered a "Notice Issued to Parties" on the Chronological Case Summary informing them of its sua sponte decision to exclude these exhibits. Appellant's App. Vol. 2 at 19. In its order dismissing the amended complaint, the court reiterated its decision based on its determination that consideration of the exhibits would require it to treat the motion as one for summary judgment under Trial Rule 56. *See* T.R. 12(B) (providing that a "motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted . . . shall be treated as one for summary judgment" if "matters outside the pleading are presented to and not excluded by the court").

Our review of the motion to dismiss suggests that Perry and BIFS asked the court to take judicial notice of those exhibits to support their argument that under the doctrine of res judicata, the amended complaint was "barred by the factual findings of [the order vacating] the prior FINRA [a]ward." Appellant's App. Vol. 5 at 5; *see also In re P.B.*, 199 N.E.3d 790, 797 (Ind. Ct. App. 2022) (quoting *In re D.P.*, 72 N.E.3d 976, 983 (Ind. Ct. App. 2017)) ("Unless principles of [res judicata] apply, judicial notice should be limited to the fact of the record's existence, rather than to any facts found or alleged within the record of another case."), *reh'g denied*, *trans. denied*. But on appeal, they merely presented a "short summary" of their res judicata argument that is underdeveloped and, consequently, falls short of the cogency required by Indiana Appellate Rule 46(A)(8). Appellees' Br. at 32; *see* App. R. 46(A)(8) (requiring an argument be "supported by cogent reasoning"); *see also Miller*, 212 N.E.3d at 657 ("We will not step in the shoes of the advocate and fashion arguments on his behalf[.]"). Accordingly, Perry and BIFS have waived their res judicata argument on cross-appeal, so we decline to address whether the court should have judicially noticed the exhibits they submitted to support that argument. *Miller*, 212 N.E.3d at 657 ("[The appellate courts] do **not** exist to answer every legal question that may exist in the ether[.])" (emphasis in original).

Altice, C.J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANT

Jacob M. O'Brien
Gabriel H. Retz
Scott L. Starr
Starr Austen & Miller, LLP
Logansport, Indiana


ATTORNEYS FOR APPELLEES

Matthew B. Steinberg
Quintairos, Prieto, Wood & Boyer, P.A.
Lexington, Kentucky

Connie M. Fickel
Rachel M. Sposato
Quintairos, Prieto, Wood & Boyer, P.A.
Los Angeles, California